**Maria Del Rosario VALLINOTO**

v.

**Edmond A. DiSANDRO et al.**

**No. 93–379–Appeal.**

Supreme Court of Rhode Island.

Feb. 11, 1997.

Joseph A. Keough, Pawtucket and Bartholme P. Malloy, for Plaintiff.

Lauren Jones and Robert W. Smith, Providence, for Defendant.

## OPINION

BOURCIER, Justice.

This case comes before us on appeal from a final judgment entered in the Superior Court following a jury's verdict in favor of the plaintiff, Maria Del Rosario Vallinoto (Vallinoto), and against the defendant, Edmond A. DiSandro (DiSandro).

## I

### Facts and Travel

In May 1987, Vallinoto retained DiSandro to represent her in a divorce action brought

against her by her former husband, Dennis Ledo (Ledo). Vallinoto, a citizen of Spain, married Ledo while living in Spain in 1977. They thereafter moved to this country. Ledo was an American citizen, but Vallinoto was not and was here on a so-called "green card." The marriage produced one child, Christina, who was also an American citizen.

Vallinoto's marriage was by no means a tranquil or a happy one. She testified that during the course of her marriage to Ledo she had been restricted to the marital home, verbally abused, badgered, and belittled. She claims to have suffered severe mental depression and stress, to have entertained suicidal thoughts, and to have been "isolated" and "victimized" by Ledo throughout the course of their ten-year marriage. It was Ledo, however, who commenced the fateful divorce proceedings, with Vallinoto later counterclaiming for divorce.

After having retained and then dismissing two other attorneys with whom she had become dissatisfied in the course of the divorce proceedings, Vallinoto retained DiSandro in May of 1987. DiSandro's legal efforts on her behalf appear to have been both well performed and successful. DiSandro was able to obtain for her an increase in the weekly child support payments previously ordered for her daughter, Christina, from $15 to $30 per week to $150 to $200 per week. Moreover, at the time that her divorce became final on April 25, 1989, Vallinoto was awarded custody of Christina, 60 percent of the marital assets, several priceless paintings and heirlooms, and attorney's fees. Vallinoto, by her own account, acknowledged receiving excellent legal representation from DiSandro in her divorce proceedings as well as successful final results, all clearly evidenced in her final judgment of divorce. Unfortunately, however, DiSandro's relationship with Vallinoto extended far beyond his legal representation of her.

In August of 1987, some three months after having been retained to represent Vallinoto in her divorce action, DiSandro and Vallinoto became involved in an intimate physical relationship. That relationship continued until Vallinoto's last hearing on her divorce petition in December of 1988. DiSandro viewed the relationship as consensual. Vallinoto, on the other hand, alleged that she was compelled to perform sexual acts with DiSandro in part because of an alleged threat that DiSandro had once made to her, stating that if he discontinued his representation of her, she would be deported and lose custody of her child. She also alleged, in like vein, that DiSandro told her that he had undertaken to represent her only because she had been referred to him by a mutual friend and that good lawyers like himself usually did not take cases that other lawyers had started, which she interpreted to mean that if he withdrew as her counsel in her case, other good attorneys would not undertake to represent her. Vallinoto asserted that as a result of those implied threats, she felt compelled to comply with DiSandro's sexual demands, fearing that he would terminate his representation of her and that she would not thereafter be able to engage another competent attorney.[1] Over the course of their approximately eighteen-month relationship, Vallinoto estimated that she and DiSandro were actively intimate almost 200 times, all without her consent. She later testified at disciplinary board hearings that the 200 number was really a guess on her part. In any event, the occurrence rather than the number is the significant factor.

During the jury trial below, DiSandro's law partner, Z. Hershel Smith (Smith), was called as a witness by Vallinoto to testify with regard to the nature of the relationship that existed between Vallinoto and DiSandro. Smith testified that contrary to Vallinoto's

1. The plaintiff has attempted to portray herself in this appeal as a helpless, penniless native of Spain, alone in this country without family or friends and limited in English speaking ability. The trial record discloses otherwise. She had attended college in Spain for three years, majoring in psychology, had married in her third year of college, lived in this country for some ten years, learned to speak English, tested for and obtained a state license to sell real estate, and was employed by a local realtor, and after a bitter and tumultuous ten-year marriage, she had filed for divorce. Her parents readily made money available to her in order to engage three different attorneys and at one point deposited $10,000 in a Rhode Island bank account which funds were available to her during her divorce litigation.

view of her relationship with DiSandro, he considered Vallinoto to be DiSandro's girlfriend. He recalled that at Christmas time, Vallinoto cheerfully came to DiSandro's law office and gave gifts to the office personnel, including DiSandro. Vallinoto herself testified that in the course of the relationship she frequently sent different greeting cards to DiSandro, many of which ended with an expression of "love" obviously intending to convey that emotion to DiSandro. Among the many trial exhibits was a greeting card containing the phrase "you got me right where I want me."

By the time Vallinoto's divorce became final in early 1989, the affairs, both legal and nonlegal, between her and DiSandro had ended. She returned, however, to DiSandro some eight months later, seeking legal assistance on another matter in which she was being sued by her former husband, Ledo. She and DiSandro did not renew their sexual intimacy during that particular attorney-client relationship, and Vallinoto has never complained of DiSandro's handling of that matter for her.

The record also reveals that Vallinoto's extramarital interests, however, were not restricted to her attorney's participation. She admitted that during her ongoing sexual relationship with DiSandro and prior to the time of concluding her divorce petition hearings and continuing on thereafter into late 1989, she was dating someone other than DiSandro. In the summer of 1989 she traveled to Hawaii with that other person and shared the same hotel room with him for some two weeks. Later, in early 1990, she then began dating a new and different man. It was while planning with this latest man to purchase a larger house in which to live together that she decided to tell him of her previous sexual relationship with DiSandro. She eventually married that man in December 1990. It was some three weeks later, in January 1991, that she decided, with the encouragement of her new husband, to commence her litigation seeking monetary damages from DiSandro.

In her civil action complaint filed in the Superior Court she asserted therein claims for legal malpractice against DiSandro and his law firm, battery and intentional infliction of emotional distress against DiSandro, deceit against DiSandro and the law firm, and negligence against the law firm.[2] She sought compensatory as well as punitive damages. After trial five separate claims were submitted to the jury, and the jury returned a general verdict for Vallinoto, covering all claims, for $25,000 in compensatory damages and $200,000 in punitive damages. DiSandro appealed.

## II

### Legal Malpractice

In order to prevail on a negligence-based legal malpractice claim, Vallinoto was required to prove that she had retained the defendant-attorney to represent her in her divorce proceeding, that the attorney had been negligent, and that the attorney's " 'negligence was the proximate cause of * * * her damages or loss.' " *Scuncio Motors, Inc. v. Teverow,* 635 A.2d 268 (R.I.1993) (per curiam). An integral part of any attorney-malpractice-negligence claim requires proof that actual damages resulted from the attorney's alleged breach of the duty arising out of the attorney-client relationship. That duty includes in essential part providing competent representation to the client, including the utilization of competent legal knowledge, skill, thoroughness and case preparation reasonably necessary both to protect and to advance the client's interests. *See, e.g.,* art. V, Rule 1.1 of the Supreme Court Rules of Professional Conduct.

In *Suppressed v. Suppressed,* 206 Ill. App.3d 918, 151 Ill.Dec. 830, 565 N.E.2d 101 (1990), a female client sued an attorney who had previously represented her in a divorce action. The client alleged a breach of fiduciary duty arising from the attorney's alleged coercion and seduction of her, which resulted in her engaging in sexual acts with him. The client claimed that she had been forced to

---

**2.** Vallinoto's complaint also asserted a claim for negligent infliction of emotional distress, but Vallinoto withdrew that count at trial.

comply with the attorney's requests for sexual intimacy because she had feared that to have refused would have jeopardized her case. After having complied with her attorney's requests a few times, the client discharged him and retained new counsel to complete her divorce action.

Although in her complaint the client did not specifically label her cause of action "legal malpractice," the Illinois court nonetheless interpreted her allegations as such. That court concluded, however, that the client had failed to demonstrate, on the evidence presented, proof of a breach of duty and damages. The court accordingly held that the client was not entitled to recovery. The client's legal malpractice claim in that case was rejected, in part, because the Illinois court refused to go as far as to hold that inherent in every attorney-client relationship was a duty to refrain from sexually intimate behavior. Instead, the court held there that "the breach of duty alleged in a legal malpractice action must be more clearly linked to the attorney's legal representation." 151 Ill.Dec. at 834, 565 N.E.2d at 105. Thus there could be no claim for legal malpractice as a result of sexual involvement between an attorney and a client unless "the attorney actually made his professional services contingent upon the sexual involvement or * * * his legal representation of the client was, in fact, adversely affected" by his sexual activities. *Id.* The court found that on the facts as alleged by the client, no evidence existed that the sexual acts were a quid pro quo for the legal services provided her.

The *Suppressed* court also found that the client failed to prove "damages stemming from a loss suffered in the client's underlying legal action or * * * that the client's legal position was somehow compromised by the breach of duty alleged." *Id.* 151 Ill.Dec. at 835, 565 N.E.2d at 106. The Illinois court reasoned that emotional damage, alone, was insufficient to sustain a legal malpractice claim because it "would be opening the door to any number of malpractice actions brought by clients who may have been less than satisfied with their legal representation but can point to no specific harm other than their own emotional distress." *Id.* The court ac-

cordingly found that there was no cause of action proven for legal malpractice and affirmed the trial court's dismissal of the client's complaint. The court did, however, in the course of its opinion, raise the possibility that on the basis of the client's allegations a claim could lie for battery or intentional infliction of emotional distress.

In *McDaniel v. Gile*, 230 Cal.App.3d 363, 281 Cal.Rptr. 242 (1991), on the other hand, a legal malpractice claim was held sufficient to withstand summary judgment in circumstances that differed factually from *Suppressed.* In *McDaniel*, the attorney involved actually withheld legal services, gave substandard legal service to the client, and delayed rendering legal services whenever his requests for sexual favors went unanswered. As a result, the client in that case ended up losing her half-interest in a pension plan and had to settle her divorce proceeding by herself, all to her disadvantage. In *McDaniel*, there was clear evidence that the sexual favors were requested as a quid pro quo for the legal services and that the client's legal position in her divorce action actually suffered as a result of her refusal to comply with her attorney's sexual requests. The *McDaniel* case facts, of course, are completely distinguishable from the facts in *Suppressed*, where the legal malpractice claim was rejected. They are also completely distinguishable from the facts before us in the instant case concerning Vallinoto and DiSandro.

The case before us involves, unlike *Suppressed* or *McDaniel*, a negligence-based legal malpractice claim as opposed to a legal malpractice claim based on a breach of fiduciary duty. However, under either theory, plaintiff's claim for legal malpractice would fail. There is no relevant probative evidence in the trial record that suggests to us that the legal services rendered by DiSandro were made contingent on sexual involvement with Vallinoto. She clearly had the ability and the knowledge to discharge and leave DiSandro at any time if she was ever dissatisfied with his legal representation in her divorce case. She had earlier, prior to retaining DiSandro, discharged two previous attorneys with whom she had been dissatis-

fied. Moreover, according to her testimony, there were more than 200 incidents of sexual encounters between her and DiSandro, some taking place after romantic dinners at intimate restaurants and others during sleep-overs at DiSandro's house. The numerous greeting cards she sent to DiSandro over the many months of the relationship, all expressing her love and affection for him, seem to indicate that it was a two-way affair. Additionally, she returned to DiSandro for legal representation long after the incidents of the alleged forced sexual relations concerned in her civil action had terminated and at a time when she was dating at least two other men, one of whom she married just before filing her action against DiSandro. All those facts suggest to us that DiSandro's legal representation was kept separate and apart from the personal relationship that he embarked upon with Vallinoto. Accordingly, even though we certainly cannot and do not condone or excuse DiSandro's actions involving his extralegal relationship with his client, there is an absence of evidence in the record before us that would support Vallinoto's contention that DiSandro's legal services departed from the standard of due care required of DiSandro in his handling of her divorce case litigation by the attorney-client relationship. We note additionally that even if a factfinder were to find that the legal services by DiSandro were a quid pro quo for sexual favors, Vallinoto's claim would still fail because of the complete absence of any competent and relevant probative evidence of damages that resulted to her legal position, or to her legal detriment personally, as a result of DiSandro's inappropriate sexual activities. She testified that DiSandro did an "excellent" job in representing her in her divorce action. She in fact received more than she had ever anticipated at the conclusion of her divorce proceeding. She was awarded custody of her child, an increase in support payments, 60 percent of the marital assets and several priceless paintings and heirlooms, as well as her attorney's fees. Her divorce action by all accounts, including hers, was certainly settled satisfactorily, and that result reflects the competency of DiSandro's legal representation. The complete absence of any evidence of damages resulting to her from his

legal efforts on her behalf prevents any recovery on a negligence-based legal malpractice claim such as the one Vallinoto asserts in her complaint.

Accordingly, we conclude that since Vallinoto failed to produce evidence of any damages resulting to her from the litigation in which she was represented by DiSandro in support of her claim for negligence-based legal malpractice, the trial justice erred in not granting DiSandro's motion for a directed verdict on the malpractice count. A directed verdict should also have been granted on the negligence-based legal malpractice count asserted against the law firm (count 6). There was absolutely no evidence presented in support of that claim at trial that could prove that DiSandro, when committing the various sexual acts with Vallinoto, was then acting on behalf of the partnership and within the reasonable scope of the partnership business. *See* Uniform Partnership Act of 1914 § 13, 6 U.L.A. 444 (1995); Uniform Partnership Act of 1994 § 305, 6 U.L.A. 44 (1995); J.R. Kemper, Annotation, *Vicarious Liability of Attorney for Tort of Partner in Law Firm*, 70 A.L.R.3d 1298, 1301 (1976). Additionally, there was, again, no competent proof of any independent breach of duty owed to Vallinoto, and, as was discussed above, there was a total absence of any evidence of specific damages resulting to her out of the litigation. A civil malpractice claim is, in essence, a negligence claim. It requires a plaintiff to prove by the fair preponderance of the trial evidence not only the defendant's duty of care, but also his or her breach thereof and the damages actually or proximately resulting therefrom to the plaintiff. Failure to prove all three of those required elements, acts as a matter of law, to bar relief or recovery.

As an appellate court, we are restricted when reviewing a trial record, to what that record discloses to us. In this case, the trial record clearly discloses that plaintiff sustained no loss or damage that she could proximately relate to DiSandro's legal performance or to his law firm's actions, in support of her count 5 and count 6 claims for malpractice based upon alleged negligence in the handling of her bitterly contested di-

vorce-custody case. It necessarily follows therefore that the jury's verdict for damages on the count 5 and count 6 claims was simply contrary to the most elementary of negligence-tort law principles and not sustainable. *See Lutz Engineering Co. v. Industrial Louvers, Inc.*, 585 A.2d 631, 635 (R.I.1991); *Forte Brothers, Inc. v. National Amusements, Inc.*, 525 A.2d 1301, 1301–03 (R.I.1987). *See also Mostoufi v. Presto Food Stores, Inc.*, 618 So.2d 1372, 1377 (Fla.Dist.Ct.App.1993); 1 Speiser, Krause, and Gans, *The American Law of Torts* § 1:11 (1983); 1 *Stein on Personal Injury Damages*, § 1:4 (2nd ed. 1991); 1 Minzer, Nates, Kimball, Axelrod, and Goldstein, *Damages in Tort Action* § 1.01[2] (1994).

■ The dissent suggests that in reviewing the sufficiency of the trial record concerning plaintiff's count 5 and count 6 negligence-based malpractice claims, we should consider DiSandro's later adjudication of having violated certain disciplinary and professional-conduct rules stemming from his extralegal sexual activities with the plaintiff.[3] Although a violation of those rules could certainly be relevant in a claim for breach of fiduciary obligation, the plaintiff in this record and proceeding made no such claim. That fact stands out in the trial record, and is actually what served as the basis for the trial justice's refusal to permit the plaintiff's proffered expert on fiduciary obligation, Professor Geoffrey C. Hazard of the Yale Law School faculty, from giving testimony on that subject. The trial justice, because of the plaintiff's pleadings, correctly noted that such proffered evidence on the plaintiff's count 5 negligence-based malpractice claim would "not be probative of issues in this case." We agree with the trial justice's precise assessment.

■ In view of that clear trial record, Vallinoto cannot hebetate the basic legal deficiency in her count 5 negligence malpractice claim by inverting it into a breach of fiduciary claim. The clear and unanimous judicial rule, as well as academic authority, is that mere violation of codes of professional responsibility and conduct do not automatically establish a private cause of action for damages sounding in negligence for breach of fiduciary obligation.

"All of the courts that have directly considered this question have held that it does not. *See Martin v. Trevino*, 578 S.W.2d 763 (Tex.Civ.App.1978); *Tingle v. Arnold, Cate & Allen*, 129 Ga.App. 134, 199 S.E.2d 260 (1973) (statute prohibiting solicitation); *Merritt–Chapman & Scott Corp. v. Elgin Coal, Inc.*, 358 F.Supp. 17 (E.D.Tenn. 1972); *Bush v. Morris*, 123 Ga.App. 497, 181 S.E.2d 503 (1971) (statute prohibiting DA from having private practice); *Lyddon v. Shaw*, 56 Ill.App.3d 815, 14 Ill.Dec. 489, 372 N.E.2d 685 (1978); *Gifford v. Harley*, 62 A.D.2d 5, 404 N.Y.S.2d 405 (1978); *Hill v. Willmott*, 561 S.W.2d 331 (Ky.App.1978); *Drago v. Buonagurio*, 46 N.Y.2d 778, 413 N.Y.S.2d 910, 386 N.E.2d 821 (1978); *Spencer v. Burglass*, 337 So.2d 596 (La. App.1976); *Noble v. Sears, Roebuck & Co.*, 33 Cal.App.3d 654, 109 Cal.Rptr. 269 (1973); *Bickel v. Mackie*, 447 F.Supp. 1376 (N.D.Iowa 1978); *Nelson v. Miller*, 227 Kan. 271, 607 P.2d 438 (1980); *Young v. Hecht*, 3 Kan.App.2d 510, 597 P.2d 682 (1979); *Friedman v. Dozorc*, 83 Mich.App. 429, 268 N.W.2d 673 (1978); *Brody v. Ruby*, 267 N.W.2d 902 (Iowa 1978). It also appears that most legal writers on this subject approve the rule as stated by these courts.

"The principal reasons for this rule, as stated in the opinions by these courts, are the following:

(a) The statute or Code of Professional Responsibility was not intended to create a private cause of action. On the contrary, the sole intended remedy for a violation of such a statute or code is the imposition of discipline by disbarment, suspension or reprimand of the offending attorney. *See, e.g., Martin v. Trevino, supra,* at 770; *Bickel v. Mackie, supra,* at 1383; *Merritt–Chapman & Scott Corp. v. Elgin Coal, Inc., supra,* at 22; *Hill v. Willmott, supra,* at 333–34, and *Noble v. Sears, Roebuck & Co., supra,* 109 Cal.Rptr. at 271–72. *See also Brody v. Ruby, supra,* at 907–08;

---

3. *In re DiSandro*, 680 A.2d 73 (R.I.1996). That opinion calling for public censure was filed on July 29, 1996, more than five years after Vallinoto had filed her civil action against DiSandro.

*Spencer v. Burglass, supra,* at 600–01, and *Tingle v. Arnold, Cate & Allen, supra,* 199 S.E.2d at 263." *Bob Godfrey Pontiac, Inc. v. Roloff,* 291 Or. 318, 630 P.2d 840, 847–48 (1981). *See also Hizey v. Carpenter,* 119 Wash.2d 251, 830 P.2d 646 (1992).

Our Rules of Professional Conduct, art.V, likewise state in the preamble:

"Violation of a Rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached. The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability."

## III

### Intentional Infliction of Emotional Distress

■■■■ We likewise conclude that the trial justice erred in not granting DiSandro's motion for a directed verdict on Vallinoto's claim for intentional infliction of emotional distress (count 2). In order to prevail on that claim, Vallinoto was required to prove extreme and outrageous conduct that intentionally or recklessly resulted in causing her severe emotional distress. *See Reilly v. United States,* 547 A.2d 894 (R.I.1988). In Rhode Island, a plaintiff must prove physical symptomatology resulting from the alleged improper conduct. *Id.* at 898.

In *McDaniel, supra.,* the court held that the client-plaintiff's claim for intentional infliction of emotional distress avoided summary judgment because in that case the plaintiff had not only proven that her attorney's sexual harassment was based on outrageous conduct but, in addition, had presented evidence of actual damages resulting to her therefrom. Claims for intentional infliction of emotional distress were also suggested by that court as being permissible upon the specific facts present in *Suppressed, supra.,* and *In re Marriage of Kantar,* 220 Ill.App.3d 323, 163 Ill.Dec. 55, 581 N.E.2d 6 (1991).

Although such a claim could potentially exist in this case, Vallinoto for whatever reason was either unable, or neglected, to produce at trial any admissible competent medical evidence showing objective physical manifestation of her alleged psychic injuries that proximately resulted to her from DiSandro's actions. Her social worker's testimony, as will later be discussed, was inherently insufficient by reason of its lack of medical-expert competence and qualification to legally establish the necessary causal relationship for any of Vallinoto's complaints of psychic injury and physical ills allegedly resulting from DiSandro's actions. Absent that necessary evidence, her claim became vulnerable to a directed verdict.

The record reflects that Vallinoto did testify that she experienced shame, headaches, fear, terror, crying, nightmares, and flashbacks, all of which she personally attributed to DiSandro's sexual conduct. However, the record additionally discloses that she had experienced most of those same ailments during her ten-year marriage to Ledo. She also testified that after her divorce case ended, she suffered from shingles. Those subjective declarations alone, without any competent supporting medical evidence tending to prove that any of her alleged physical ills were proximately caused by DiSandro's conduct and were not simply the aftermath of her recently concluded tumultuous marriage to Ledo, were insufficient to withstand the motion for a directed verdict. *See Parrillo v. F.W. Woolworth Co.,* 518 A.2d 354, 356 (R.I.1986). Although Vallinoto was competent to testify that she suffered psychic problems and allegedly experienced physical symptomatology therefrom, she was, however, as was her social worker, not qualified to testify that those specifically alleged psychic and physical ills were proximately caused by DiSandro's actions.[4] The origin and the causal connection of those psychic and physical complaints to her affair with DiSandro required expert medical opinion. *See, e.g.,*

---

4. The fact that she experienced some of the same symptoms during her first marriage is relevant because no medical evidence was presented at trial that established that Vallinoto's complaints were proximately caused by her relationship with

DiSandro and not by her turbulent marriage to Ledo. *Cf. Parrillo v. F.W. Woolworth Co.,* 518 A.2d 354, 356 (R.I.1986) (medical evidence must "exclude other unrelated potential causes of plaintiff's * * * injury").

*Marshall v. Tomaselli*, 118 R.I. 190, 372 A.2d 1280 (1977). *See also Maietta v. United Parcel Service, Inc.*, 749 F.Supp. 1344 (D.N.J.1990), *aff'd without opinion*, 932 F.2d 960 (3rd Cir.1991); *Collette v. Collette*, 177 Conn. 465, 418 A.2d 891 (1979); *Woods v. Brumlop*, 71 N.M. 221, 377 P.2d 520 (1962); *Matchen v. McGahey*, 455 P.2d 52 (Okla. 1969). Had there been any competent medical evidence to establish the required causal connection between Vallinoto's alleged shingles and DiSandro's conduct, we would not hesitate to uphold the trial justice's submission of the intentional infliction of emotional distress count to the jury. However, the absence of such evidence was fatal to Vallinoto's claim, and the trial justice erred in not granting DiSandro's motion for a directed verdict on the intentional infliction of emotional distress count.

Vallinoto in her appeal appears to have commingled and thus confused her count 2 (intentional infliction of severe mental distress) and her count 5 (negligence-malpractice) claims. She appears to overlook the legal distinction and proof requirements that exist between her negligence claim and her intentional infliction of severe mental distress claim, often referred to as "the tort of outrage."[5] A careful reading of her complaint reveals that what she actually complained about was DiSandro's unconsented sexual encounters with her as being the cause of the emotional injuries she alleged. Her complaint centered itself upon DiSandro's alleged deliberate and *intentional* sexual misconduct.

"Where mental injury is the sole complaint, recovery for direct damages may be allowed if the jurisdiction recognizes a tort for infliction of mental distress. *Such an action, however, is not for legal malpractice but for a wrong intended to inflict emotional injuries.* Similarly, conduct, which is not negligent, such as sexual assault, is governed by ordinary tort rules." 2 Mallen & Smith, *Legal Malpractice*, § 19.11 at 612 (4th ed. 1996). (Emphasis added.)

Vallinoto apparently overlooks the fact that while she did allege in a separate complaint count (count 2) the tort of intentional infliction of emotional distress in which she sought damages for the sexual assaults perpetrated upon her by the defendant,[6] we require for recovery, however, along with the vast majority of judicial authority, that psychic as well as physical injury claims must be supported by competent expert medical opinion regarding origin, existence, and causation. *See, e.g., Ondis v. Pion*, 497 A.2d 13, 17 (R.I.1985). In the trial record facts before us the plaintiff failed to produce any legally admissible competent medical evidence to support her self-serving uncorroborated statements that she sustained "nightmares," "anxiety," "headaches," "stomach aches," "nausea," and "flashbacks" as the proximate result of her sexual encounters with the defendant. Medically unsupported claims for those very same complaints have been consistently rejected by the vast majority of courts in this country. *See, e.g., Gagne v. Northwestern National Insurance Co.*, 881 F.2d 309 (6th Cir.1989); *J.B. v. Bohonovsky*, 835 F.Supp. 796 (D.N.J.1993); *Butler v. Westinghouse Electric Corp.*, 690 F.Supp. 424 (D.Md.1987); *Fitch v. Voit*, 624 So.2d 542 (Ala.1993); *Odegard v. Finne*, 500 N.W.2d 140 (Minn.App.1993); *Hendrix v. Wainwright Industries*, 755 S.W.2d 411 (Mo.App. 1988); *Ruple v. Brooks*, 352 N.W.2d 652 (S.D.1984); *Garvey v. Buhler*, 146 Wis.2d 281, 430 N.W.2d 616 (App.1988).

It is interesting to note that the case record reveals that Vallinoto testified at deposition proceedings on January 10, 1992, that she had in fact been examined by at least three competent medical doctors and other personnel regarding her alleged emotional-psychic complaints, none of whom were called by her to testify. In fact, the first attorney that she had retained to sue DiSandro referred her to one of those physicians for an evaluation of her complaints. That attorney was given a report of the doctor's

---

5. For an instructive discussion of the origin and nature of that tort, see *Kazatsky v. King David Memorial Park*, 515 Pa. 183, 527 A.2d 988, 993–95 (1987), and *Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295, 298–99 (Ky.Ct.App.1993).

6. We accept as fact that the admitted sexual encounters constituted unconsented batteries because of the jury's findings.

pretrial medical evaluation. However, as noted, none of the doctors were called to testify in support of Vallinoto's complaints, and no medical affidavits from them were ever offered at trial in support of her count 2 claim.

## IV

### Social Worker's Testimony

■ DiSandro has also challenged in this appeal the admissibility of the testimony of Vallinoto's social worker as it pertained to Vallinoto's count 2 claim for damages. The social worker testified that Vallinoto was suffering from post-traumatic stress disorder, a condition about which DiSandro argues that the social worker was not qualified to give expert opinion testimony. In *State v. Willis*, 256 Kan. 837, 888 P.2d 839 (1995), the Kansas court held that a social worker, while eminently qualified as such, was not qualified to "diagnose medical and psychiatric conditions such as post-traumatic stress disorder." *Id.* 888 P.2d at 845. In *Ouellette v. Carde*, 612 A.2d 687 (R.I.1992), we there held that a social worker could testify about psychotherapy if qualified, but could not give expert medical opinion. The social worker in *Ouellette* had been closely supervised by a physician and had worked together with him in such a manner that the social worker's therapy was a part of the physician's work. The implicit holding of *Ouellette* is that, absent the close working relationship between the social worker in that case and the physician, and the physician's supervision involved therein, the social worker would not have been able to testify concerning the psychotherapy sessions in such detail as he was permitted to do so in that case. We note, however, that the social worker in *Ouellette*, despite having been given generous testimonial leeway, was still not permitted to give a final medical diagnosis or an expert medical opinion. *See Willis*, 888 P.2d at 845. In the case before us, Vallinoto's social worker did not work with assistance from, or under the supervision of, any physician when she counseled Vallinoto. Thus although she may arguably have been qualified to relate the facts concerning the psychotherapy session itself, she certainly was not qualified to expand

upon those facts and to give an expert medical opinion on, and a diagnosis of, post-traumatic stress disorder. The trial justice herself properly recognized the social worker's inherent medical-expert-witness-qualification deficiency. The trial justice stated that the social worker "was not qualified to testify." However, the trial justice thereafter nonetheless erroneously permitted the social worker to give medical expert opinion testimony despite her earlier reluctance to recognize the witness's qualification to do so.

■ In any trial after the remand, if the social worker is then able to present sufficient qualification enabling her to give expert medical opinion, she should, it would appear, then be able to testify in regard to the hearsay statements made to her by Vallinoto for the purpose of obtaining psychological treatment and diagnosis. *In re Jean Marie W.*, 559 A.2d 625 (R.I.1989). Such testimony by a registered and qualified independent clinical social worker would be admissible pursuant to Rule 803(4) of the Rhode Island Rules of Evidence. Thus, Vallinoto's social worker might very well be able to testify about the hearsay statements made to her by Vallinoto if those statements were given for the purpose of diagnosis or treatment and not given for the purpose of preparing for litigation or for providing testimony at trial.

■ We also note for purposes of guidance during any new trial after remand that the challenged statements, which described the sexual abuse Vallinoto allegedly suffered at the hands of DiSandro, would not be deemed inadmissible simply on the basis that they tended to assign fault, as asserted in this appeal by DiSandro. Those statements were not made to a physician examining a patient for physical evidence of a crime. *See State v. Lima*, 546 A.2d 770 (R.I.1988); *State v. Pina*, 455 A.2d 313 (R.I.1983). In *Pina* and *Lima* we held that statements that assign fault and that are made to a medical doctor searching for physical evidence of sexual abuse are inadmissible. However, Vallinoto was being treated for psychological ailments, not physical ones, and the statements made by her to her social worker regarding her sexual activity with DiSandro were di-

rectly relevant to the diagnosis of her mental state and the treatment that she was receiving for her alleged mental anguish and would be admissible. *In re Jean Marie W.,* 559 A.2d at 630. Unlike the situation in *Lima* and *Pina,* the statements of the child victim in *Jean Marie* were introduced "to establish that sexual abuse had actually occurred but did not act to fix fault * * *." *Id.*

We note that the dissent makes reference to the Restatement (Second) *Torts* § 46 (1965) and several judicial holdings in support of its position that any lay person plaintiff may allege and sue for physical or mental claims of injury and by their own lay opinion testimony, unsupported by any competent medical testimony or evidence, establish origin, existence, and proximate causation thereof. That contended authority is clearly distinguishable on the facts in this case. The several cited supporting judicial holdings concerned cases that primarily involved questions of pleading wherein the actions had been dismissed while in the pleading stage and were later reversed on appeal and remanded for trial in light of the very liberal rule permitting an action to overcome dismissal motions at the pleading stage if it appears reasonably probable that the plaintiff, within the framework of the complaint, might be able at trial to produce evidence that might eventually support the complaint's claim. *Bragg v. Warwick Shoppers World, Inc.,* 102 R.I. 8, 227 A.2d 582 (1967). That is not what has been presented to us in this appeal. In this case the record clearly reveals that the plaintiff had her full day in court and had full opportunity to present any medical supporting evidence that she was capable of producing to prove her count 2 alleged mental sufferings. Her exiguous attempt to do so, however, was solely by means of the testimony of her social worker psychotherapist who, although found not qualified by the trial justice to proffer medical opinion in regard to cause or causation of the plaintiff's alleged headaches and other complaints of alleged ills, was nonetheless permitted to testify in regard to cause and causation. The trial justice prophetically noted, prior to permitting the social worker psychotherapist to give the limited but prejudicial testimony regarding the plaintiff's complaints, *"I'll probably regret it. She was not qualified to testify, but I'll let her, and the jury can consider it for whatever it's worth."* No reported case law condones that nature of admissibility.

"As a proposition, the recovery of consequential damages for mental or indirect physical injuries should comport with the jurisdictional rules applicable to ordinary tort actions. Thus, if a cognizable wrong, proximate causation and actual damages all exist, recovery should be allowed. Because claims for emotional or some physical injuries often are uncertain or speculative, attempts to recover for such injuries typically fail unless the plaintiff produces persuasive supporting evidence." 2 Mallen & Smith, *Legal Malpractice,* § 19.11 at 616.

The plaintiff's count 2 claim for intentional infliction of severe mental distress fails because it was founded on the social worker psychotherapist's testimony. For that basic reason, the jury's verdict cannot withstand judicial muster and must be set aside.

"We are not required here to determine whether King David's conduct reached the level of 'outrageousness' that would support recovery of money damages under section 46 [Restatement (Second) of *Torts* (1965)], because of a glaring failure in the chain of proof required to establish this claim. The Kazatskys presented no expert testimony, indeed no evidence at all except their own unsubstantiated averments, concerning their alleged injuries. To permit recovery on the basis of such a questionable showing would necessitate a radical departure from settled principles of Pennsylvania tort doctrine.

" * * *

"It is basic to tort law that an injury is an element to be proven. Given the advanced state of medical science, it is unwise and unnecessary to permit recovery to be predicated on an inference based on the defendant's 'outrageousness' without expert medical confirmation that the plaintiff actually suffered

the claimed distress. Moreover, the requirement of some objective proof of severe emotional distress will not present an unsurmountable obstacle to recovery. Those truly damaged should have little difficulty in procuring reliable testimony as to the nature and extent of their injuries. We therefore conclude that if section 46 of the Restatement is to be accepted in this Commonwealth, at the very least, existence of the alleged emotional distress must be supported by competent medical evidence." *Kazatsky v. King David Memorial Park, Inc.*, 515 Pa. 183, 527 A.2d 988, 992, 995 (1987).

We too find ourselves reluctant to adopt the position espoused by the plaintiff as it pertains to her count 2 claim. Such would indeed constitute "radical departure" from long-settled and universal elementary tort principles. Such radical action in any event is totally unnecessary because the plaintiff at retrial will be permitted to pursue her requests for compensatory as well as punitive damages and to recover all to which she can prove she is legally entitled in her remaining viable causes of action.

## V

### DiSandro's Threatening Conduct

DiSandro asserts that the admission at trial of evidence relating to threats he allegedly made to Vallinoto's former husband and to her former husband's attorney was inadmissible. We agree. Pursuant to Rule 404 of the Rhode Island Rules of Evidence, character evidence is inadmissible to show that a person acted in conformity therewith. Moreover, if those acts were not admitted to show conformity therewith but were instead admitted to show a basis for Vallinoto's fear of DiSandro, that evidence would still be inadmissible. Those acts were not sufficiently similar to the acts alleged against DiSandro by Vallinoto to be relevant to, or at all probative of, the coercion allegedly directed to and felt by Vallinoto. Even assuming that DiSandro had acted aggressively toward Vallinoto's former husband and his attorney, that alleged aggression was not probative of the fact that DiSandro had acted aggressively toward Vallinoto or that Vallinoto had any

reason to fear that such aggression would ever be directed toward her. In fact, DiSandro's alleged threats could more plausibly be interpreted to have been for the purpose of defending and protecting Vallinoto. We not only view that evidence as being improper character evidence but also believe that its probative value, if relevant at all, was substantially outweighed by the danger of unfair prejudice resulting to DiSandro and should not have been admitted, pursuant to Rule 403 of the Rules of Evidence. Accordingly, we find that admission of that evidence was error.

## VI

### New Trial

Because the jury returned a general verdict that awarded Vallinoto both compensatory and punitive damages, we are unable to determine therefrom the quantum of the impact that the error infected legal malpractice and intentional infliction of emotional distress counts, as well as the other trial errors, had in the actual computation and composition of the total award. The trial justice submitted all counts in the complaint to the jury in such form that only a general verdict could be returned. No special findings were requested by the parties. Consequently, it is impossible for us to determine upon which counts the jurors relied in returning their verdict in respect to liability and damages. Since certain counts should not have been submitted to the jury for the reasons heretofore stated, the general verdict is tainted. We cannot say what portion of the general total verdict reflects a finding and an award stemming from an issue on which a directed verdict should have been returned. In accordance with our holding in *Reynolds v. Missler*, 80 R.I. 59, 90 A.2d 779 (1952), we are constrained to order a new trial, despite our being satisfied that sufficient evidence existed to support submission of the claims in counts 1, 4, and 9 to the jury. Failure to do so would result in our permitting the plaintiff to recover multiple recoveries for defendant's sexual misconduct that appears to be the sole basis for her multiple claims. "[D]uplicature recovery for the same underlying behavior is prohibited." *Borden*

v. *Paul Revere Life Ins. Co.*, 935 F.2d 370, 383 (1st Cir.1991)(citing *Diversified Graphics, Ltd. v. Groves*, 868 F.2d 293, 295 (8th Cir.1989)). The plaintiff's "recovery on the intentional infliction claim [that we have reversed] barred any incremental award of damages on the fraud claim." *Id.*

In addition, we note that the jury verdict questionnaire reports a general award for compensatory as well as punitive damages for all five of plaintiff's claims. Two of those five claims, intentional infliction of emotional distress and fraud, are the identical claims noted by Judge Selya in *Borden*. On the uncontroverted facts contained in the jury's general verdict, the plaintiff here was in fact awarded duplicative as well as incremental damages for the same underlying conduct of defendant, namely, the sexual assaults and the deceit employed in accomplishing those sexual assaults. Clearly the law as recognized in *Borden* prohibits that recovery. *See also DeCosta v. Viacom International, Inc.*, 758 F.Supp. 807 (D.R.I.1991).

> "a plaintiff may not get additional bites of the apple by demanding multiple forms of relief for the same injury or by cloaking a single claim in a variety of legal theories." *Id.* at 812.

In this case, it is legally impossible to reasonably measure or determine the propriety of the jury's bite, because only one fact remains clear, and that is, that all five of the plaintiff's claims were swallowed up in that one bite, leaving to absolute conjecture how much or what portion of the total general verdict award was attributable to any particular one of the five claims considered by the jury.

Because we are ordering a new trial, we need not address DiSandro's other and various claims of error.

## VII

### Conclusion

Having disposed of the issues essential to the resolution of DiSandro's appeal, we deem

it necessary to comment upon the record before us. It is a record that reflects negatively upon DiSandro's conduct during the course of his lawyer-client representation of Vallinoto. Such conduct, in our opinion, was reprehensible and not in keeping with the professional conduct demanded of attorneys licensed to practice law in our state courts. Nothing stated in our opinion today, which is based solely upon long-settled general principles of law, should be construed in any manner to imply that we condone such sexual behavior as was visited upon DiSandro's client during the time when he was representing her and her interests in a most delicate and traumatic divorce action. The bar is cautioned to maintain, in its client relationships, such circumspect conduct that in no instance could cause the public to question the posture of the lawyer in his or her professional role as an advocate. Any appearance of assignation should never be suspect.

We notwithstanding sustain DiSandro's appeal and vacate the final judgment of the Superior Court. The papers of this case are remanded to that court for a new trial and further proceedings in accordance with this opinion.

FLANDERS, Justice, dissenting.

I respectfully dissent because I believe that the defendant Edmond A. DiSandro's sexual depredation of the plaintiff while serving as her divorce attorney constituted a flagrant breach of the fiduciary duties he owed to his client and that this breach constituted legal malpractice. When, as here, a lawyer handling a divorce for a client enters into a sexual relationship with that client, I believe that lawyer has committed legal malpractice, regardless of the legal results obtained and how well the lawyer has performed the necessary legal services.[7] Such

7. In this case, the defendant's legal services included having his client sign and submit false interrogatory answers to the court and to opposing counsel for the purpose of concealing their sexual relationship. After the defendant spuriously advised the plaintiff—a foreign-born, Spanish-speaking woman with a limited ability to

converse in English—that her postseparation sexual relationship with him was "irrelevant" to her divorce and custody case, he prepared these bogus answers and gave them to her to sign. Pursuant to the defendant's fraudulent legal advice, and notwithstanding her ongoing sex-for-legal-services relationship with the defendant, the

misconduct is "a wrong that is distinct and independent from professional negligence *but still is legal malpractice.*" (Emphasis added.) 2 Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice* § 14.1 at 229 (4th ed. 1996).[8]

To reach a contrary result, I would have to perform radical surgery on plaintiff's legal-malpractice claim and downsize it into a shrunken and dismembered professional-negligence cause of action. Further, I would have to lop off from the body of plaintiff's malpractice case the fiduciary duties owed by lawyers to their clients. But I can neither subscribe to such a procrustean, negligence-based vision of the duties arising from the attorney-client relationship nor can I exalt the "successful" results achieved in this litigation over the devious and coercive means employed by the defendant/lawyer to achieve such a pyrrhic victory. Furthermore, I am unwilling to amputate the fiduciary legs from plaintiff's malpractice cause of action, thereby leaving her to jump through the requisite legal hoops with only the bloody stumps of a professional-negligence claim to land on. So hobbled, her malpractice case would inevitably falter.

I believe that this case presented us with an opportunity to establish, once and for all, that in Rhode Island (as elsewhere) attorneys are fiduciaries charged not only with the duty to perform their work competently but also with "[u]nflinching fidelity to their [clients'] genuine interests." *Berman v.*

*Coakley,* 243 Mass. 348, 137 N.E. 667, 670 (1923). Upholding the jury's verdict and the judgment below would also discredit the regnant popular ethos of the litigator as a "hired-gun," pursuant to which, if the lawyer performs well and obtains successful results, then the client will not be heard to complain about any incidental fraud, philandering, or unethical self-dealing committed by the lawyer along the way.

In awarding damages to plaintiff for defendant's sexual abuse of his client, the jury obviously decided to put this lawyer's money where his mouth was. Because I cannot say that result was erroneous, I believe we should affirm the judgment and uphold the jury's verdict finding the defendant/lawyer guilty of having committed legal malpractice, fraud, battery, and intentionally inflicting plaintiff (his own client) with emotional distress.

## I

### Defendant Committed Legal Malpractice by Breaching the Fiduciary Duties He Owed to His Client

To prevail in a legal-malpractice action, a plaintiff must establish that an attorney-client relationship existed, that the defendant-attorney breached a duty arising out of that relationship, and that as a result of the defendant's breach the plaintiff suffered harm.[9] *See generally Evora v. Henry,* 559

---

plaintiff signed the interrogatory answers prepared by the defendant and denied under oath having engaged in any extramarital sexual relations. Thus, in this respect the defendant's legal efforts on the plaintiff's behalf were not legal, nor were they on her behalf but rather part of a campaign to cover up his own unethical self-aggrandizement at the plaintiff's expense.

**8.** *Accord Resolution Trust Corp. v. Holland & Knight,* 832 F.Supp. 1528, 1532 (S.D.Fla.1993) (both professional negligence and breach of fiduciary duty claims are, "at root, malpractice claims"); *Bukoskey v. Walter W. Shuham, CPA, P.C.,* 666 F.Supp. 181, 184 (D.Alaska 1987) (professional negligence is the failure to use reasonable care in the rendition of professional services whereas breach of fiduciary obligations requires a failure to carry out one's duty of loyalty or fidelity, or evidence that the attorney committed some sort of fraud upon the client); *Solomon v.*

*Aberman,* 196 Conn. 359, 493 A.2d 193, 205 (1985) (the plaintiff's claim against the defendant for "breach of fiduciary obligation * * * is by another name a claim for legal malpractice"); *Calhoun v. Rane,* 234 Ill.App.3d 90, 175 Ill.Dec. 304, 307, 599 N.E.2d 1318, 1321 (1992) (in a legal malpractice case an injured plaintiff may plead separate counts of both professional negligence and breach of fiduciary duty).

**9.** Upon the formation of an attorney-client relationship, the attorney owes his or her client duties that tend to fall into three general categories: (1) the duty of care, (2) the duty of loyalty, and (3) the duties embodied in any contract that is created concerning the terms of the attorney's engagement. *Owen v. Pringle,* 621 So.2d 668, 671 (Miss.1993). Breach of any one of these duties can form the basis of a cause of action for legal malpractice, including an action for damages or for the recovery of attorney's fees. *Solo-*

A.2d 1038, 1039 (R.I.1989) (the attorney's negligence must be the proximate cause of the plaintiff's loss); 1 Mallen & Smith, § 8.1 at 555.

Among the various duties a lawyer owes to a client is the duty to " 'at all times * * * represent his client and handle his client's affairs with the utmost degree of honesty, forthrightness, loyalty and fidelity.' " *Resolution Trust Corp. v. Holland & Knight*, 832 F.Supp. 1528, 1531 (S.D.Fla.1993). Indeed, the attorney's fiduciary obligations of trust, loyalty, and confidentiality are common-law duties "acknowledged by every American jurisdiction" that "predate and exist despite independent, codified ethical standards" of conduct. 2 Mallen & Smith, § 14.1 at 227–29. Accordingly clients are entitled to expect their attorney not only to act competently in representing their interests in the underlying action for which the attorney has been engaged but also to carry out diligently all the fiduciary obligations the attorney owes to them.[10] The lawyer's duty to satisfy the fiduciary obligations owed to the client are independent of any duties the lawyer has to comply with professional disciplinary rules and codes of behavior. Thus, even if defendant had never violated any rules of professional conduct and had never been disciplined by this court for engaging in the conduct that is at issue here, he would still be liable to this plaintiff, Maria Del Rosario Vallinoto.

Here plaintiff alleged, and the jury found, that defendant misused his position of trust as plaintiff's attorney to threaten and deceive her into a sex-for-legal-services relationship, one in which he alternately flimflammed and coerced her into submitting to his sexual demands in exchange for his continued legal representation of her interests in her divorce and custody case. Count 5 of plaintiff's complaint, entitled "Legal Malpractice v. DiSandro," expressly alleged that defendant "entered into an attorney/client relationship * * * wherein he promised to represent * * * [plaintiff's] legal interests *faithfully* and to exercise *independent* professional judgment *on her behalf.*" (Emphases added.) She also alleged that by "virtue of his conduct" defendant breached his duty to her by "deceiving her, by engaging in dilatory tactics in the divorce proceeding and in *otherwise acting in his own personal interests to the exclusion of hers during the course of his professional representation* " of her. (Emphasis added.) Although plaintiff did not expressly use the term "breach of fiduciary duty" in fashioning her claim for legal malpractice, that is precisely the type of misconduct she alleged in her complaint when she described defendant's actions. Thus, this was not just a "negligence-based-legal malpractice claim" limited solely to the breach of an attorney's duty to perform legal services competently, but it was also a claim based on the conflict of interest defendant

---

mon, 493 A.2d at 207; *Owen*, 621 So.2d at 671; *Singleton v. Stegall*, 580 So.2d 1242, 1245 (Miss. 1991); *Steinfeld v. Dworkin*, 147 Vt. 341, 515 A.2d 1051, 1051 (1986).

**10.** As a fiduciary, attorneys "are required to conduct themselves according to the highest ethical and moral standards." *Bank of Mill Creek v. Elk Horn Coal Corp.*, 133 W.Va. 639, 57 S.E.2d 736, 748 (1950). As the Supreme Judicial Court of Massachusetts once remarked:

"It is a matter of profound importance from every point of view that members of the bar be * * * of probity and rectitude, jealous to maintain relations of utmost honesty with their clients and solicitous to protect them against legal wrong. Unflinching fidelity to their genuine interests is the duty of every attorney to his clients. Public policy hardly can touch matters of more general concern than the maintenance of an untarnished standard of conduct by the attorney at law toward * * * client[s]. *The attorney and client do not deal*

with each other at arm's length. The client often is in many respects powerless to resist the influence of his attorney. If that influence be vicious, untoward, [or] criminal, the relation of trust is abused and becomes the source of wrong." (Emphasis added.) *Berman v. Coakley*, 243 Mass. 348, 137 N.E. 667, 670–71 (1923).

An attorney's pursuit of interests adverse to or conflicting with his or her client's interests constitutes a breach of the attorney's fiduciary obligations to that client and exposes the attorney to liability for legal malpractice. *See, e.g., Fielding v. Brebbia*, 399 F.2d 1003 (D.C.Cir.1968), *aff'd after remand*, 479 F.2d 195 (D.C.Cir.1973); *Majumdar v. Lurie*, 274 Ill.App.3d 267, 210 Ill.Dec. 720, 653 N.E.2d 915 (1995); *Lakoff v. Lionel Corp.*, 207 Misc. 319, 137 N.Y.S.2d 806 (N.Y.Sup. Ct.1955); *see also Apple v. Hall*, 412 N.E.2d 114, 116 (Ind.Ct.App.1980) (representation of an interest adverse to a present or former client is "a failure to exercise the knowledge, skill, and ability ordinarily possessed and exercised by members of the legal profession").

created with his client when he entered into a sexual relationship with her.

The plaintiff testified that when she was initially confronted with defendant's insistence on a sexual retainer, defendant not only threatened to drop her case but also told her that as he was now her third lawyer, no other attorney would agree to represent her if he refused to do so. The defendant then communicated to plaintiff that if she did not submit to his sexual demands, he would withdraw as her counsel, whereupon she would lose custody of her daughter and be deported to her native Spain. Thereafter, and notwithstanding his ongoing sexual relations with her, defendant prepared answers to interrogatories for plaintiff to sign under oath that falsely represented to opposing counsel and to the Family Court that she had not engaged in sexual relations with any person other than her husband during the couple's marriage. To justify this perjurious dissembling, defendant also fraudulently misrepresented to plaintiff that she could deny having had sexual relations with him in her sworn interrogatory answers because their postseparation trysts were allegedly "irrelevant" to the pending divorce action and child-custody proceedings. When faced with these facts, the jury and the trial justice understandably had little trouble in rejecting any notion that defendant's legal representation was kept separate and apart from the sexual relationship he embarked upon with plaintiff.

Indeed, when this court first considered defendant's conduct, we concluded that by gratifying his own sexual desires with plaintiff while handling her divorce action, defendant created "an inherent conflict with [his] obligation to represent the client properly."[11] *In re DiSandro*, 680 A.2d 73, 75 (R.I.1996). Moreover, he did so while purposely giving her false legal advice to gain her sexual favors, misusing his position as her attorney to have her sign false court documents, and defrauding her into engaging in sexual relations with him as part of the quid pro quo for his legal services.

If I were to accept the suggestion that there is no relevant probative evidence indicating that defendant's legal services were contingent on plaintiff's willingness to grant him sexual favors, I would be riding roughshod over what the jury necessarily decided after assessing the witnesses' credibility, hearing all the evidence, and returning verdicts on every count in plaintiff's favor. Although defendant claimed that the relationship was purely consensual and that some of plaintiff's greeting cards and other actions showed how she not only agreed to but actually came to relish their "lexual" relationship, the jury and the trial justice were entitled to conclude otherwise. It was their function,

---

11. We recently sanctioned defendant for violating the applicable ethical rules of professional conduct in his actions toward plaintiff. In doing so, we noted that even if (contrary to what the jury found here) a divorce attorney's sexual relationship with a client is consensual, such a relationship "creates an inherent conflict" with the client's interests in maximizing his or her share of the marital property distribution and in obtaining custody of any children of the marriage. *In re DiSandro*, 680 A.2d 73, 75 (R.I.1996); *see also In re DiPippo*, 678 A.2d 454 (R.I.1996). Specifically we stated that

"[a]n attorney who engages in sexual relations with his or her divorce client places that client's rights in jeopardy. *The lawyer's own interest in maintaining the sexual relationship creates an inherent conflict with the obligation to represent the client properly.* When an attorney represents a divorce client in a case in which child custody, support, and distribution of marital assets are at issue, the attorney *must refrain* from engaging in sexual relations with the client *or must withdraw* from the case." (Emphases added.) *DiSandro*, 680 A.2d at 75.

Given the "inherent conflict" created by defendant's legal representation of plaintiff in her divorce case while engaging in sexual relations with her, I believe he could not possibly have kept his legal representation separate and apart from his personal relationship with plaintiff. Indeed, if a lawyer has an "inherent conflict," this means that it is impossible for the lawyer to keep the conflicting interests separate and apart. Moreover, defendant's preparation of false interrogatory answers denying any such extramarital sexual relationship refutes any suggestion that he was able to keep his sexual relationship with plaintiff separate from his legal services on her behalf. Finally, the gist of plaintiff's testimony was that defendant's numerous requests for office consultations and other parleys alone with plaintiff to discuss her case were all pretexts for defendant to ravish her. This is precisely why we concluded that defendant's "own interest in maintaining the sexual relationship create[d] an inherent conflict with the obligation to represent the client properly." *DiSandro*, 680 A.2d at 75.

not ours, to evaluate the credibility of these witnesses in the context of the other factual circumstances presented to them. *E.g., Donnelly v. Grey Goose Lines, Inc.,* 667 A.2d 792, 794–95 (R.I.1995). These included, for example, plaintiff's extremely vulnerable position as a native Spaniard isolated from her friends and family in a foreign country. Though she was far from destitute, plaintiff had no family here, few if any friends in this country, and only a limited English-language facility. Moreover, she was not only isolated but emotionally frazzled after the traumatic breakup of her turbulent marriage to a domineering and controlling husband. In defendant's own words, when she came to see him about serving as her lawyer, plaintiff "had nothing" and "was down at the lowest ebb." The jury was therefore entitled to conclude that at this time of crisis in her life plaintiff was ill-equipped to fend off the sexual rapacity and fraudulent cunning of her own lupine lawyer-turned-Lothario. Since reasonable minds could differ in regard to how these facts should be interpreted, it was plainly proper for the trial justice to submit plaintiff's legal-malpractice claim to the jury. *See, e.g., Long v. Atlantic PBS, Inc.,* 681 A.2d 249, 255 (R.I.1996).[12]

There is also a growing body of case law from other jurisdictions that can be cited for the proposition that the attorney-client relationship, once established, cannot be exploited by the attorney to his own sexual advantage and to his client's detriment.[13] An attorney's foremost obligation to the client must be loyalty and trust—not the attorney's personal sexual gratification at the client's expense. Thus, a client who is damaged monetarily, physically, or emotionally by the attorney's breach of his or her fiduciary duties through sexual exploitation of the client should be able to recover for legal malpractice regardless of whether the attorney's legal efforts were performed well and successfully.[14]

12. Because defendants are challenging the denial of their new-trial motion, all the facts must be viewed in a light most favorable to plaintiff, and all reasonable inferences must be drawn in her favor. *See, e.g., Long v. Atlantic PBS, Inc.,* 681 A.2d 249, 252 (R.I.1996). We have also noted on numerous occasions that, in deciding a new-trial motion, it is the function of the trial court, and not of this court on appeal, to assess the credibility of the witnesses. Moreover, in passing on a directed-verdict motion, the trial justice should make no credibility determinations at all but simply determine whether any evidence exists on which a rational factfinder could base a favorable verdict for the nonmoving party. *E.g., Morris v. Zuckerman,* 680 A.2d 937, 938 (R.I.1996). Unless examination of the record reveals that the trial justice was clearly wrong or overlooked or misconceived material evidence, these types of determinations at trial are conclusive. *E.g., Donnelly v. Grey Goose Lines, Inc.,* 667 A.2d 792, 794–95 (R.I.1995). On this record I believe the trial justice correctly concluded that sufficient evidence existed to deny defendants' directed-verdict and new-trial motions and to support the jury's ultimate verdict that defendant's misconduct constituted legal malpractice.

13. *See, e.g., McDaniel v. Gile,* 230 Cal.App.3d 363, 281 Cal.Rptr. 242, 247 (1991) ("[t]he withholding by a retained attorney of legal services when sexual favors are not granted by a client and engaging in sexual harassment of the client are outrageous conduct"); *Tante v. Herring,* 264 Ga. 694, 453 S.E.2d 686, 688 (1994) (the defendant attorney's "misuse, to his own [sexual] advantage, of confidential information in medical and psychological reports concerning [the client] obtained in and solely because of" attorney's representation of the client was a breach of fiduciary duty for which attorney was liable for damages); *In re Marriage of Kantar,* 220 Ill.App.3d 323, 163 Ill.Dec. 55, 58–60, 581 N.E.2d 6, 9–11 (1991) (allowing a divorce client to petition the court to recalculate attorney's fees in part because the attorney allegedly billed her for time during which the attorney and client had sexual relations); *see also Owen v. Pringle,* 621 So.2d 668, 669–71 (Miss.1993) (when the plaintiff's attorney became sexually involved with the plaintiff's ex-wife, the attorney's breach of his fiduciary duty was actionable even though he did not mishandle the negligence case against the plaintiff's chiropractor).

14. The defendant's reliance on *Suppressed v. Suppressed,* 206 Ill.App.3d 918, 151 Ill.Dec. 830, 565 N.E.2d 101 (1990), an intermediate appellate court's opinion from another state, is unpersuasive for several reasons. First, it is factually distinguishable. In *Suppressed,* the Illinois Appellate Court held that an attorney's seduction of a divorce client did not state a claim for legal malpractice "unless there [was] tangible evidence that the attorney actually made his professional services contingent upon sexual involvement *or* that his legal representation of the client was, in fact, adversely affected." (Emphasis added.) *Id.* 151 Ill.Dec. at 834, 565 N.E.2d at 105. In contrast to the facts here, the divorce client in *Suppressed* never alleged (much less, as here, proved) that the defendant attorney directly threatened her or that he made his legal services

Moreover, I would affirm the judgment below that the law firm of DiSandro–Smith & Associates, P.C., Inc., is also liable to plaintiff for having committed legal malpractice. Lawyers admitted to the practice of law in Rhode Island may do so in the form of a professional-service corporation. *See* G.L. 1956 §§ 7–5.1–1 to –12. The legal professional service corporation, like the attorneys employed by it, performs legal services and can act only through its officers and agents. Consequently the actions of its officers and agents committed in furtherance of the corporation's rendition of legal services are acts that may be imputed to the corporation. *See In re Rhode Island Bar Association,* 106 R.I. 752, 761, 263 A.2d 692, 697 (1970); *see generally* 1 Mallen & Smith, § 5.4.

Here defendant was president and secretary of DiSandro–Smith & Associates, P.C., Inc., a professional service corporation. In rendering legal services to plaintiff, he breached his fiduciary duties to her and committed legal malpractice. Z. Hershel Smith (Smith), defendant's only partner in the firm, knew defendant was "dating" plaintiff while her divorce proceeding was pending but failed to inquire further or to take any steps whatsoever to abate the conflict of interest inherent in such a relationship or to avert the deleterious consequences it could have on the client's interests in the pending divorce proceeding. Both defendant and Smith knew or should have known that they had a duty to avoid this inherent conflict of interest with their client and a duty to withdraw from representation if such a conflict did arise in the course of the legal representation. They failed on both accounts.

Since the corporation itself engages in the rendering of professional services through its officers and agents, under Rhode Island law "the corporate entity will be liable for the misprisions of its members to the extent of the corporate assets." *In re Rhode Island Bar Association,* 106 R.I. at 761, 263 A.2d at 697. For these reasons I would also affirm the legal-malpractice judgment entered against defendant law firm.

## II

### Plaintiff Suffered Damages as a Result of Defendant's Legal Malpractice

The defendant contends that even if his legal services were a quid pro quo for plaintiff's sexual favors, plaintiff's malpractice claim would still fail because she presented no evidence of damages either to her legal position or to herself personally. But I agree with the jury and the trial justice that plaintiff was indeed damaged by defendant's misconduct.

First, the jury may well have agreed with plaintiff that defendant purposely prolonged plaintiff's divorce proceedings to maximize the time and the number of occasions for his own sexual gratification at plaintiff's expense.[15] Moreover, he deliberately provided plaintiff with improper legal advice regarding plaintiff's possible deportation and loss of custody of her child to coerce her to submit to his sexual demands, all of which understandably caused her considerable emotional and physical distress. He also advised plaintiff to sign and file false interrogatory answers, thereby potentially subjecting her to contempt and criminal charges and exposing

---

contingent on his having sex with her. Rather, the *Suppressed* plaintiff contended that she yielded to the defendant's sexual advances because she felt that were she to refuse, the defendant would not adequately advocate for her best interests. *Id.* 151 Ill.Dec. at 832, 565 N.E.2d at 103. Here, defendant was much less subtle, insisting that plaintiff yield to his sexual needs or suffer his withdrawal from the case, her deportation to Spain, and the loss of custody of her daughter. Second, the *Suppressed* court inappropriately focused solely on the attorney's "duty to provide competent legal representation," *id.* 151 Ill.Dec. at 834, 565 N.E.2d at 105, rather than also consider the attorney's fiduciary duty to exercise good faith and fair dealing toward the client.

Third, there was no evidence in *Suppressed,* as there was here, that the defendant attorney deceived the plaintiff/client to advance his own personal interests at her expense by giving her false legal advice and by having her swear falsely to facts submitted to the court in connection with her divorce case.

15. The evidence established that defendant recorded approximately 430 hours and thirty-eight court appearances for what the jury might have justifiably concluded was a relatively straightforward, no-fault divorce. Regarding the length of the case and her role in it, plaintiff testified that she "never knew what was going on" and that "[t]he time goes by, by, by, nothing happened."

any settlement in the divorce action to collateral attack by her former husband. Upon discovering the truth about what his wife was doing with this defendant while she was seeking custody of their child and a generous marital property distribution, plaintiff's former husband might well have sought to rescind such a settlement on the basis that he too was a victim of defendant's fraud. *See* R.P.Dom.Rel. 60(b) (allowing a court to relieve a party from a final judgment, order, or proceeding for, inter alia, fraud, misrepresentation, or other misconduct).

The plaintiff also testified, and the jury found, that defendant battered her physically and emotionally, causing her such severe emotional distress that she "was a mess" and suffered recurrent nightmares, nausea, anxiety attacks, shame, terrible headaches, crying fits, shingles,[16] and flashbacks. Moreover, since September 6, 1990, plaintiff had been counseled and treated by a licensed social worker to ameliorate the emotional fallout from defendant's perfidious legal representation.

Further, I disagree with the argument that for plaintiff to recover *any* damages caused by defendant's legal malpractice, she must have suffered unsatisfactory results in the underlying divorce action causing her pecuniary loss. Legal malpractice is an action in tort, and an attorney is liable for *all* types of foreseeable damages proximately caused by his or her wrongful acts or omissions, not just pecuniary losses.[17] Generally, when a person suffers damages because of another's intentional tortious acts, that person is entitled to recover any and all losses caused by the tortfeasor's misconduct, including, in certain circumstances, punitive damages, compensatory damages, damages attributable to emotional distress pain, and suffering, scarring or other permanent injury, loss of enjoyment of life or reduced life expectancy, humiliation, loss of consortium, and any other consequential damages and monetary relief potentially available to victims of tortious misconduct. *See Kaya v. Partington*, 681 A.2d 256, 263 (R.I.1996) (Flanders, J., dissenting) (listing cases). Indeed, the very purpose of tort law is to compensate those persons injured as a result of another's tortious acts. W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 1 at 6 (5th ed. 1984). Thus, if an attorney commits legal malpractice by breaching fiduciary duties, the attorney may be liable for, inter alia, exemplary or punitive damages, for the cost of retaining another attorney to correct or to minimize any adverse consequences to the client caused by his or her flawed legal representation and/or for any damages attributable to the client's emotional suffering.[18]

16. "Shingles" is a colloquial term sometimes used by lay persons to describe a skin eruption. *See Doe v. Johnson*, 817 F.Supp. 1382, 1396 (W.D.Mich.1993) (characterizing shingles as a " 'common malad[y]' " on par with "headaches, nondescript spots on body, weakness and fatigue"); *see generally* The American Heritage Dictionary of the English Language 1665 (3d ed. 1996). The medical nomenclature for shingles is herpes zoster. *See* PDR Medical Dictionary 791, 1608 (1st ed. 1995). The plaintiff, who was fluent in Spanish but not in English, used the vernacular description "shingles" to relate what she experienced as an abnormal and painful skin condition and not to provide any type of medical diagnosis. Thus, it was proper for the trial justice to admit such lay opinion evidence. *See Gadsden General Hospital v. Hamilton*, 212 Ala. 531, 103 So. 553 (1925); 31A Am.Jur.2d *Expert and Opinion Evidence* §§ 199–210 (1989).

17. *See, e.g., Fishman v. Brooks*, 396 Mass. 643, 487 N.E.2d 1377, 1379 (1986) ("[a]n attorney who * * * [commits malpractice] is liable to his client for any reasonably foreseeable loss caused by his negligence"); *see also* 2 Ronald E. Mallen

& Jeffrey M. Smith, *Legal Malpractice* § 19.4 at 602–04 (4th ed. 1996).

18. *See, e.g., Wagenmann v. Adams*, 829 F.2d 196 (1st Cir.1987) (client entitled to emotional-distress damages when attorney's negligence caused client to be involuntarily committed to mental institution); *Delesdernier v. Porterie*, 666 F.2d 116 (5th Cir.1982) (attorney liable for client's emotional distress caused by his malicious withdrawal as counsel two months before trial); *Elliott v. Videan*, 164 Ariz. 113, 791 P.2d 639 (App.1989) (client's loss due to attorney's negligence justified imposition of punitive damages); *Liles v. Liles*, 289 Ark. 159, 711 S.W.2d 447 (1986) (attorney liable for damages incurred in setting aside a divorce property settlement agreement occasioned by attorney's fraud and professional misconduct); *De Pantosa Saenz v. Rigau & Rigau, P.A.*, 549 So.2d 682 (Fla.Dist.Ct.App.1989) (former client allowed to proceed against attorney for attorney's fees arising out of a rescission action necessitated by attorney's unauthorized selling of former client's property); *David v. Schwarzwald, Robiner, Wolf & Rock Co., L.P.A.*, 79 Ohio App.3d 786, 607 N.E.2d 1173 (1992)

Moreover, merely because plaintiff received a satisfactory pecuniary result in her underlying divorce action does not mean that but for defendant's outrageous sexual misconduct, a better or quicker pecuniary settlement could not have been obtained for her without plaintiff having to become the attorney's concubine for the extended length of her divorce proceedings. Nor does a satisfactory pecuniary settlement mean that plaintiff is precluded from recovering damages for her physical and mental suffering sustained as a direct result of defendant's breach of his fiduciary obligations. Indeed, even absent pecuniary loss, a client may recover damages for emotional suffering and humiliation when such damages are sustained as a result of the attorney's breach. *E.g., Wagenmann v. Adams,* 829 F.2d 196, 221–22 (1st Cir.1987); *Delesdernier v. Porterie,* 666 F.2d 116, 124 (5th Cir.1982); *David v. Schwarzwald, Robiner, Wolf & Rock Co., L.P.A.,* 79 Ohio App.3d 786, 607 N.E.2d 1173, 1182 (1992).

Thus I would affirm the judgment below awarding plaintiff damages for the personal injuries she suffered as a result of defendant's legal malpractice.

### III

### Defendant's Intentional Infliction of Emotional Distress upon Plaintiff Resulted in Physical Symptoms That Were Properly Admitted into Evidence

Next, defendant contends that the trial justice erred by submitting plaintiff's claim of intentional infliction of emotional distress to the jury because plaintiff allegedly failed to prove any objective symptoms of physical injury as manifestations of her mental anguish.[19] For plaintiff to recover on her claim for intentional infliction of emotional distress she had to establish that defendant's conduct was extreme and outrageous, that he knew or should have known that his actions would likely cause her emotional harm, and that she suffered severe emotional distress as a result of defendant's extreme and outrageous actions. *See, e.g., Reilly v. United States,* 547 A.2d 894, 898 (R.I.1988). A defendant will be found liable for such conduct if it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 898 (quoting Restatement (Second) *Torts* § 46 cmt. d (1965)).

Here, by conditioning his legal services on plaintiff's granting him sexual favors, defendant was certainly guilty of outrageous conduct. Equally outrageous were his preparation of false interrogatory answers for plaintiff to sign, his knowing submission of these answers to the court and to opposing counsel, and his threats involving plaintiff's deportation and loss of custody of her minor child. Such conduct by a lawyer is so reprehensible as to be intolerable in a civilized community.[20]

Moreover, in addition to the elements listed above, a plaintiff alleging an infliction-of-emotional-distress claim in this jurisdiction must also establish that his or her mental anguish objectively manifested itself in the form of some physical ill.[21] The requirement of physical symptomatology, this court has explained, is to ensure the genuine nature of the mental distress. *Reilly,* 547 A.2d at 898. Thus in *Reilly* this court held that absent

(compensatory damages may be awarded for mental suffering and humiliation if sustained as result of wrongful, intentional, and willful conduct by attorney in legal-malpractice claim); *accord Rhodes v. Batilla,* 848 S.W.2d 833, 844 (Tex.App.1993); *see also Stanley v. Richmond,* 35 Cal.App.4th 1070, 41 Cal.Rptr.2d 768, 784 (1995); *Perez v. Kirk & Carrigan,* 822 S.W.2d 261, 266–67 (Tex.App.1991).

19. At trial, plaintiff withdrew her claim of negligent infliction of emotional distress.

20. *Cf. Singleton v. Foreman,* 435 F.2d 962, 971 (5th Cir.1970) (attorney may be liable to a client in an action for emotional distress because of his threatening conduct); *McDaniel,* 281 Cal.Rptr. at 247–49 ("[t]he withholding by a retained attorney of legal services when sexual favors are not granted by a client and engaging in sexual harassment of the client are outrageous conduct" sufficient to support a claim of intentional infliction of emotional distress).

21. *E.g., Clift v. Narragansett Television, L.P.,* 688 A.2d 805, 812–813 (R.I.1996); *Curtis v. State Department for Children and Their Families,* 522 A.2d 203, 208 (R.I.1987).

physical symptomatology, a mother claiming emotional trauma as a result of a physician's negligence during childbirth could not recover damages in an action for negligent infliction of emotional distress. The reason, the court emphasized, was the "reluctant[ance] to impose potentially unlimited and undeserved liability upon a defendant who is guilty of *unintentional* conduct." (Emphasis added.) *Id.*[22]

Here, plaintiff presented evidence that the emotional trauma inflicted upon her by defendant manifested itself in the form of various physical ailments. First, she testified that the stress of her relations with defendant caused her to experience recurring nightmares, anxiety attacks, headaches, shingles, nausea, crying fits, and flashbacks. Second, she presented expert testimony from a social worker/sexual-abuse counselor that plaintiff exhibited symptoms of posttraumatic stress disorder that would require years of counseling to remedy.

The defendant contends that absent expert *medical* testimony, plaintiff's statements regarding her own physical condition were incompetent and inadmissible. Specifically, defendant argues that plaintiff lacked the requisite medical skills necessary to express a valid opinion in regard to whether she had developed shingles, much less to attribute the onset of this condition to defendant's sexual exploitation of her.

But laypeople lacking medical training have long been allowed to testify to the external and internal characteristics of their own physical condition or to the state of their own health.[23] It is only when the subject matter is wholly scientific or so far removed from the usual and ordinary experience of the average lay person that expert testimony is essential. *See, e.g., Marshall v. Tomaselli,* 118 R.I. 190, 196–98, 372 A.2d 1280, 1284–85 (1977) (requiring an expert medical witness in a medical-malpractice case to support the plaintiff's allegation that she was injured as a result of the defendant physician's negligence in performing major surgery on her or in treating her "rare and serious condition" after the operation because (1) the treatment was "neither sufficiently common nor sufficiently nontechnical that a layman could be expected to appraise it" and (2) the attribution of a causal relationship between the plaintiff's injuries and the defendant doctor's alleged negligence "was beyond the ken of the average layman"); R.I.R.Evid. 701; *cf.*

---

22. Note, however, that in an action like this one for intentional infliction of emotional distress, this reluctance should diminish (if not vanish altogether) because now the wrongful conduct is not unintentional but deliberate. Thus, the growing trend among many jurisdictions has been to permit plaintiffs claiming *intentional* infliction of emotional distress to recover damages for their mental anguish without first requiring them to prove that they suffered from any accompanying physical injuries. *See Clift,* 688 A.2d at 815–816 (Flanders, J., concurring in part and dissenting in part) (collecting cases); *Agis v. Howard Johnson Co.,* 371 Mass. 140, 355 N.E.2d 315 (1976); *see also* Annotation, *Modern Status of Intentional Infliction of Mental Distress as Independent Tort; "Outrage",* 38 A.L.R.4th 998 (1985) (hereinafter *"Outrage"*); Restatement (Second) of *Torts* § 46 (1965); Merle H. Weiner, *Domestic Violence and the Per Se Standard of Outrage,* 54 Maryland L.Rev. 183, 197 (1995) (reporting that of the forty-eight states recognizing the tort of intentional infliction of emotional distress, all but three have adopted the Restatement's formulation); Mandana Shahvari, Comment, *AfrAIDS: Fear of AIDS As a Cause of Action,* 67 Temp.L.Rev. 769, 781 (1994) (noting that the trend in these cases "has been to abandon the requirement that emotional distress de-

velop into physical injury"). The driving force behind this trend is the increasing recognition that it is precisely the outrageous, the extreme, and the intentional nature of the defendant's conduct that makes that conduct *inherently* injurious. *"Outrage,"* 38 A.L.R.4th at 998; Restatement (Second) *Torts* § 46 (1965).

23. *See, e.g., Stuckey v. Rhode Island Co.,* 42 R.I. 450, 453, 108 A. 581, 583 (1920) (citing with approval cases and authorities distinguishing incompetent medical opinions by lay witnesses from such witnesses testifying to the external appearance of their own injuries as well as to their " 'feeling, pains, and symptoms, as well as to all the characteristics of the injury, external and internal[;] [t]his was the limit' " of the lay witnesses' competency); *see also* 31A Am.Jur.2d *Expert and Opinion Evidence* §§ 199–210 (1989); H.D. Warren, Annotation, *Admissibility of opinion evidence as to cause of death, disease, or injury,* 66 A.L.R.2d 1082 § 8 (1959). Thus, for example, it has been held that a plaintiff (in an action for false imprisonment) may testify that she was not a nervous person before the imprisonment but that she was afflicted with nervousness and suffered from nightmares thereafter. *Gadsden General Hospital v. Hamilton,* 212 Ala. 531, 103 So. 553 (1925).

R.I.R.Evid. 702. But here, unlike the situation in *Marshall*, the personal injuries plaintiff experienced were not rare diseases requiring scientific explanation but everyday illnesses with garden-variety symptoms that are familiar to lay witnesses.

In addition, it is widely accepted elsewhere that persons like this plaintiff who claim to suffer from such common ailments as colds, indigestion, headaches, nausea, or skin rashes may testify about the nature and cause of their ailment without the need for expert medical testimony.[24] This plaintiff was competent to go to the jury with such lay-opinion evidence not as expert-medical diagnosis but as a lay witness's description of her own physical condition based on her personal observations and experience.[25]

Consequently, like any other lay witness, plaintiff was competent to testify about her own physical condition before and after her relationship with defendant and about whether, after her sexual encounters with him, she developed symptoms of extreme nervousness, nausea, skin rashes, sleeplessness, nightmares, and flashbacks. The plaintiff's testimony in this regard was not an incompetent attempt at a medical self-diagnosis but an effort by her to relate to the jury the various physical symptoms and conditions she experienced following defendant's physical and emotional abuse of her. Further, considering plaintiff's difficulty with and inexperience in expressing herself in English, the trial justice did not abuse her discretion in affording plaintiff a certain amount of latitude in the manner in which plaintiff described her physical condition to the jury.

## IV

### The Trial Justice Properly Allowed the Jury to Hear the Social Worker's Testimony Concerning Plaintiff's Posttraumatic Stress Disorder

The defendant also challenges the admissibility of the testimony of Suzanne Bowman (Bowman), plaintiff's psychotherapist and social worker. He contends that Bowman's status as a social worker, as opposed to that of a medical doctor, precludes her from testifying to her opinion that plaintiff suffers from a syndrome known as posttraumatic-stress disorder (PTSD). Citing *Ouellette v. Carde*, 612 A.2d 687 (R.I.1992), defendant asserts that a psychotherapist/social worker can testify *only* if he or she has been closely supervised by a medical physician, is qualified as an expert in the field of psychotherapy, and does not give expert medical opinion. Accordingly he claims that Bowman's testimony diagnosing plaintiff as suffering from

**24.** See State v. Orsini, 155 Conn. 367, 232 A.2d 907, 910 (1967) ("state of pregnancy is such a common condition that a woman may give her opinion that she herself is pregnant"); *City of Goshen v. England,* 119 Ind. 368, 21 N.E. 977 (1889) (broken foot); *Inter–Southern Life Insurance Co. v. Stephenson,* 246 Ky. 694, 56 S.W.2d 332, 335 (1933) (laypersons "may testify as to matters within * * * [their] knowledge concerning the[ir] vigor and apparent physical condition and as to well-known and recognized symptoms indicating disease"); *Tierney v. Minneapolis & St. Louis Railway Co.,* 33 Minn. 311, 23 N.W. 229, 233 (1885) (skin disease); *Owens v. Kansas City, St. Joseph & Council Bluffs Railroad Co.,* 95 Mo. 169, 8 S.W. 350, 352 (1888) (partial paralysis), *disapproved on other grounds by Moore v. Ready Mixed Concrete Co.,* 329 S.W.2d 14, 23–24 (Mo.1959) (en banc).

**25.** For these same reasons nonexperts have been permitted to testify about the cause of numerous injuries. *Wagner Electric Corp. v. Snowden,* 38 F.2d 599 (8th Cir.1930) (gas caused burning sensation in eyes, nose, throat, and chest); *Solano v. Carnival Cruise Lines, Inc.,* 491 So.2d 325 (Fla.

Dist.Ct.App.1986) (plaintiff seaman "was competent to testify as a lay witness regarding the effect that noxious fumes which emanated from an oil-based paint had upon *his* body"); *Lanier v. State,* 141 Ga. 17, 80 S.E. 5 (1913) (death caused by strangulation); *Suddith v. Incorporated City of Boone,* 121 Iowa 258, 96 N.W. 853 (1903) (noxious gases caused sickness); *Patterson v. Blatti,* 133 Minn. 23, 157 N.W. 717 (1916) (marks on a thumb were tooth marks from bite); *Letcher v. Skiver,* 99 Okla. 269, 226 P. 1029 (1924) (external injuries caused by auto accident); *Novak v. Miller,* 97 Okla. 144, 223 P. 155 (1924) (bruises and cuts caused by being thrown to pavement); *Egede–Nissen v. Crystal Mountain, Inc.,* 93 Wash.2d 127, 606 P.2d 1214 (1980) (plaintiff is qualified to explain differences in pain or discomfort of her pregnancy and birth-giving prior to accident and pregnancy and birth-giving subsequent to accident); *Wright v. City of Fort Howard,* 60 Wis. 119, 18 N.W. 750 (1884) (miscarriage suffered on day after a fall); *see also* 31A Am.Jur.2d *Expert and Opinion Evidence* §§ 199–210 (1989); H.D. Warren, Annotation, *Admissibility of Opinion Evidence as to Cause of Death, Disease, or Injury,* 66 A.L.R.2d 1082 § 8 (1959).

PTSD was an improper attempt to provide expert medical opinion by one who is not a licensed physician. *But see In re Jean Marie W.*, 559 A.2d 625, 629, 630 n. 8 (R.I.1989) (affirming a trial justice's decision to allow a social worker to testify to her diagnosis of sexual abuse as the cause of her patient's emotional injuries).

In the case of *In re Jean Marie W.*, not only was the social-worker expert allowed to testify concerning the patient's hearsay statements made to her during the course of psychological treatment but we also affirmed the trial justice's decision to allow the social worker to give her expert opinion and diagnosis that sexual abuse was the cause of her patient's emotional injuries. *Id.* Thus, in this jurisdiction, proving the cause of emotional-distress complaints does not require expert *medical* opinion.

Rule 702 of the Rhode Island Rules of Evidence provides:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by *knowledge, skill, experience, training, or education,* may testify thereto in the form of fact *or opinion.*" (Emphas-

es added.) *Accord State v. Porraro*, 121 R.I. 882, 892, 404 A.2d 465, 471 (1979).

Whether a witness possesses sufficient knowledge, skill, experience, training, or education to qualify as an expert concerning a particular subject matter rests primarily in the trial justice's discretion, and absent a showing of abuse this court will not disturb the exercise of that discretion on appeal. *State v. Fogarty*, 433 A.2d 972, 978 (R.I. 1981).

Here, after the trial justice properly qualified Bowman as an expert in the field of psychotherapy, she allowed Bowman to testify that plaintiff suffered from symptoms consistent with PTSD. Bowman based her opinion not only on her formal education and professional training in diagnosing and counseling sufferers of PTSD but also on her own personal observations and treatment of plaintiff during two years of counseling sessions. Bowman's extensive formal education and her practical experience in the field of psychotherapy support the trial justice's broad discretion to qualify her as an expert and to admit her testimony as a practicing psychotherapist.[26] Thus there was no error in admitting this testimony.[27]

---

**26.** Bowman was licensed as Certified in Social Work in Rhode Island and as a Licensed Independent Clinical Social Worker in Massachusetts for approximately ten years. She has an undergraduate degree from Brown University and a master's degree in social work from Boston University. Before starting her own psychotherapy practice, Bowman participated in several supervised internships and engaged in over 3,000 supervised hours of clinical social work. She specialized in counseling individuals who had been sexually abused or who suffered from drug addictions or eating disorders.

**27.** After qualifying Bowman as an expert witness in the field of psychotherapy and immediately following Bowman's testimony concerning plaintiff's PTSD, the trial justice, in denying defendant's motion to strike the testimony, commented:

"I'm going to overrule you [that is, not strike Bowman's testimony] and I'll probably regret it. She was not qualified to testify, but I'll let her[,] * * * and * * * [the jury can] consider it for whatever it's worth."

It should be noted, however, that these comments were uttered immediately after defense counsel argued that *Ouellette v. Carde*, 612 A.2d

687 (R.I.1992), mandated that opinion testimony by social workers be corroborated by expert medical testimony and after plaintiff conceded that there was no plan to offer such corroborating testimony. For the reasons set forth herein, I believe *Ouellette* imposes no such requirement. Further, a psychotherapist or social worker specially trained and educated in diagnosing people with symptoms of PTSD or rape-trauma syndrome is not the equivalent of a licensed physician rendering medical diagnoses or providing expert medical testimony. Many jurisdictions have recognized that professional therapists other than physicians possess expertise in the diagnosis and treatment of PTSD. *See* Gregory G. Sarno, Annotation, *Admissibility, at Criminal Prosecution, of Expert Testimony on Rape Trauma Syndrome*, 42 A.L.R.4th 879 (1985); James O. Pearson, Jr., Annotation, *Admissibility of Expert or Opinion Testimony on Battered Wife or Battered Woman Syndrome*, 18 A.L.R.4th 1153 (1982); *cf.* J.A. Bock, Annotation, *Qualification of Nonmedical Psychologist to Testify as to Mental Condition or Competency*, 78 A.L.R.2d 919 (1961).

Moreover, Bowman candidly told the jury that she was not a licensed physician and therefore could not dispense medication or render medical diagnoses. Nonetheless, she stated that she was

Contrary to defendant's arguments, the holding in *Ouellette* does not stand for the proposition that a social worker's expert opinion is admissible at trial only if that opinion is formed under the close supervision of a licensed medical practitioner. In *Ouellette*, the court focused on the closeness of the psychiatrist/social worker relationship, not for the purpose of creating a new rule barring expert-opinion testimony by social workers unless it is formulated under the aegis of a licensed medical doctor, but for the purpose of refuting the argument proffered by the defendant concerning the competency of the psychiatrist's testimony. There, the defendant argued that the psychiatrist should not have been allowed to testify because he had delegated the counseling of Ouellette to a social worker and therefore lacked personal knowledge of Ouellette's treatment. The court not only rejected this argument but also upheld the admission of the social worker's testimony as an expert witness in psychotherapy. *Ouellette*, 612 A.2d at 693. Consequently the *Ouellette* court permitted each expert, properly qualified as such, to testify about their respective roles in treating the plaintiff without establishing any requirement that a social worker must first show supervision by a medical doctor before he or she can testify as an expert. *Cf. Fogarty*, 433 A.2d at 978 (no abuse of discretion in refusing to qualify a counselor in the treatment of alcoholism as an expert when he held no academic degree in the subject matter, had no expertise in the diagnosis of alcoholism, and had no medical knowledge).

Plainly the trial justice's decision to admit the social worker's testimony in this case comports not only with the result in *Ouellette* but also with our holding in *In re Jean Marie W.* There, this court held that

> "the Family Court justice was properly within his discretion in allowing this [social worker] witness to render a diagnosis based on her status as a registered, independent clinical social worker pursuant to G.L.1956 (1987 Reenactment) chapter 39 of title 5. Her extensive formal education and practical experience in the field of child social work also support this decision." 559 A.2d at 630 n. 8.

The rationale underlying our decisions and those from other states [28] to allow such expert testimony to be admitted into evidence is that if the professional therapist or social worker qualifies as an expert under the applicable rules of evidence and if his or her testimony can assist the factfinder in the determination of the issues, any restrictions that operate to bar the admission of such probative testimony should be cautiously imposed and heavily justified. Because no such justification exists here, the discretionary decision of the trial justice to allow the social worker Bowman to testify as an expert in psychotherapy concerning her diagnosis of plaintiff's PTSD should be upheld, just as we did in *In re Jean Marie W.*

## V

## Evidence of Defendant's Assaults upon Plaintiff's Husband and His Attorney Was Properly Admitted

The defendant also challenges the admission of testimony relating to physical assaults on plaintiff's former husband and threats al-

competent to recognize and treat patients suffering from PTSD and certain other emotional maladies within her expertise. Fully cognizant of this fact, the trial justice ruled that Bowman's testimony was admissible, "not [as] a medical opinion * * * [but as] a social worker's opinion." *Accord In re Jean Marie W.*, 559 A.2d 625, 630 n. 8 (R.I.1989) (affirming allowance of social worker to testify in regard to her diagnosis of sexual abuse).

28. Rhode Island does not stand alone in its decision to allow social workers and other licensed and professional counselors and therapists who are not physicians to testify concerning treatment and diagnosis of emotional-trauma syn-

dromes like PTSD. *See, e.g., Knock v. Knock*, 224 Conn. 776, 621 A.2d 267 (1993) (sociologist—battered-woman syndrome); *Simmons v. State*, 504 N.E.2d 575 (Ind.1987) (psychiatric social worker—rape-trauma syndrome); *State v. Reeder*, 105 N.C.App. 343, 413 S.E.2d 580 (1992) (psychologist—child sexual abuse); *State v. Schumpert*, 312 S.C. 502, 435 S.E.2d 859 (1993) (mental health counselor—rape-trauma syndrome); *State v. Bubar*, 146 Vt. 398, 505 A.2d 1197 (1985) (rape counselor—rape-trauma syndrome); *accord Hawthorne v. State*, 408 So.2d 801 (Fla.App. 1982) (clinical psychologist—battered-woman syndrome); *State v. Robinson*, 146 Wis.2d 315, 431 N.W.2d 165 (1988) (rape counselor—rape-trauma syndrome).

legedly made by defendant in her presence to her former husband's attorney on the grounds that the admission of such evidence violated Rule 404(b) of the Rhode Island Rules of Evidence,[29] was unduly prejudicial, and completely irrelevant. I disagree.

Here plaintiff claimed that she was terrified of defendant and that he tricked and intimidated her into a sexual relationship with him. The defendant, on the other hand, claimed that plaintiff's participation was consensual. Consequently evidence of specific acts of personal intimidation perpetrated by defendant and made in the presence of plaintiff were potentially of critical importance to the consent issue and to both the reasonableness and the credibility of plaintiff's charges of alleged intimidation by defendant. *See State v. Tribble,* 428 A.2d 1079, 1085 (R.I. 1981); *see also State v. Martinez,* 651 A.2d 1189, 1195 (R.I.1994) (evidence of criminal conduct is admissible if it is relevant to the issues in the case). Since the "paramount purpose of our rules of evidence is to ensure that the trier of fact will have before it all relevant, reliable, and probative evidence on the issues in dispute," evidence of defendant's propensity to resort to acts and threats of physical violence both in plaintiff's presence and of which she was aware were properly admitted to apprise the jury of her state of mind during the period of defendant's alleged coercion and ongoing sexual abuse of her. *Tribble,* 428 A.2d at 1085.[30]

Here plaintiff testified that following the taking of a deposition held at defendant's law office, defendant took her former husband's attorney by the collar and threw him out of the room. She also claimed that outside the courtroom, during court proceedings, defendant assaulted her former husband with a clenched fist and later bragged to her about what he intended to do to him. Although prejudicial to defendant, this evidence was relevant to show the reasonableness of plaintiff's sense of physical intimidation, of her emotional fear of defendant, and of the alleged coercive sway that he held over her.

## VI

**Because Plaintiff's Battery and Fraud Claims, Standing Alone, Support the Damages Awarded by the Jury, the Judgment Should Be Affirmed and No New Trial Should Be Granted—Even if the Malpractice and Emotional–Distress Claims Had Been Improperly Submitted to the Jury**

The defendants, DiSandro and DiSandro, Smith & Associates, P.C., Inc., contend that if they are successful in showing that a directed verdict should have been granted on even one of the five counts of wrongdoing that were submitted to the jury, then they are entitled to a new trial on the remaining counts. They assert that *Reynolds v. Missler,* 79 R.I. 89, 83 A.2d 914 (1951), *aff'd on reh'g,* 80 R.I. 59, 90 A.2d 779 (1952), stands for the proposition that when multiple counts have been submitted to a jury, a judgment entered in favor of a party after a general verdict must be reversed when evidence of any one of the several counts is insufficient to support its consideration by the jury. *See also Welsh Manufacturing, Division of Textron, Inc. v. Pinkerton's, Inc.,* 474 A.2d 436, 441–42 (R.I.1984). The reason for such a result, they contend, is that the very nature of the general verdict renders it impossible

**29.** Rule 404(b) of the Rhode Island Rules of Evidence provides in pertinent part:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or to prove that defendant feared imminent bodily harm and that the fear was reasonable."

In like manner Rule 405(b) states:

"In cases in which character or a trait [of] character of a person is an essential element of

a charge, claim, or defense, or when evidence is offered under Rule 404(b), proof may also be made of specific instances of the person's conduct."

**30.** Although relevant evidence may be excluded on the ground that its probative value is substantially outweighed by the danger of unfair prejudice, R.I.R.Evid. 403, unless such evidence is of "marginal relevance and enormously prejudicial, the trial justice should not act to exclude it." *Wells v. Uvex Winter Optical, Inc.,* 635 A.2d 1188, 1193 (R.I.1994).

for the court to determine whether the jury based its verdict "*solely*" on the improperly submitted count. (Emphasis added.) *Reynolds*, 79 R.I. at 91, 83 A.2d at 915.

However, this is decidedly *not* the situation we have here. In both *Missler* and *Pinkerton's*, general verdicts were returned in favor of the plaintiff without any special findings made by the jury in regard to the defendant's liability on each of the separate causes of action for which damages had been sought.[31] Thus, in either *Missler* or *Pinkerton's*, it was impossible for this court to determine on which theory or theories the jury relied in rendering its plaintiff's verdict. Because it was theoretically possible that the jury's verdict was based *solely* on the improperly submitted claim, a new trial on the remaining counts had to be ordered.[32]

But in contrast to *Missler* and *Pinkerton's*, here special interrogatories were submitted to the jury concerning each count that it was to consider, and the jury's answers to these interrogatories disclosed that it found defendant to be liable on each of the separate theories of recovery that plaintiff presented—namely, battery, intentional infliction of emotional distress, legal malpractice, and fraud. It also found the law firm liable for having committed legal malpractice. The plaintiff was awarded $25,000 in compensatory damages against both defendant and the law firm and $200,000 in punitive damages against defendant alone.[33] Hence it is clear

from these answers what theories of liability the jury relied upon in rendering its verdict for plaintiff. Further, the damages claimed by plaintiff and assessed by the jury were not specific or peculiar to any one count alleged but were common to each theory of liability relied upon by plaintiff in seeking recovery (that is, plaintiff's physical suffering, her severe emotional distress, and her extreme humiliation).

In fact the evidence in support of plaintiff's damages was identical for each count and would not have varied one iota whichever theory or theories of liability were allowed to go to the jury. Nor is there any evidence whatsoever of any duplicative or multiple recovery in the jury's award. In any case, defendant never objected to the form of the verdict or to the special interrogatories that were submitted. Consequently he has waived any claim based on this theory, and I cannot see why a new trial should be required on the battery and fraud claims.

Indeed, we have said that the very purpose of having a trial justice submit written interrogatories to the jury (together with a request for a general verdict) is to avoid "[s]uch a crisis of uncertainty" about which counts, if any, the jury finds a defendant to be liable. *Seabra v. Puritan Life Insurance Co.*, 117 R.I. 488, 503, 369 A.2d 652, 661 (1977); *see also* Super.R.Civ.P. 49. In *Seabra* this court distinguished *Missler* on the basis that in *Seabra* "evidence [existed] sup-

---

31. In *Welsh Manufacturing, Division of Textron, Inc. v. Pinkerton's, Inc.*, 474 A.2d 436 (R.I.1984), interrogatories were submitted to the jury but those interrogatories, unlike the ones used here, did not indicate which of the various theories of liability the jury based its verdict on, that is whether the defendant was negligent in the hiring, training, supervision, *or* assignment of its security guard.

32. *Missler* is also distinguishable because, unlike the claims in this case, the count improperly submitted to the jury there "was totally foreign to and inconsistent with the cause of action on trial," *Reynolds v. Missler*, 80 R.I. 59, 62, 90 A.2d 779, 781 (1952), *aff'g*, 79 R.I. 89, 83 A.2d 914 (1951), that is, one that was factually unrelated and thus not properly joined with the stated cause of action. For that reason the *Missler* court stated:

   "In the peculiar circumstances of this case it is unnecessary to decide whether special findings were necessary to determine the existence

of prejudicial error and whether plaintiffs or defendant had the burden to request such findings. These might be appropriate questions where all the counts in a declaration are consistent and proper under the action stated in the writ [that is, they all arise out of one factual context], but not where, as here, a count for an entirely different cause of action is imported into the declaration without legal justification * * *." *Id.* at 63, 90 A.2d at 781.

33. According to the judgments entered by the Superior Court, the compensatory-damage award ran against "defendants Edmond DiSandro, et al[.]," while the punitive damage award ran against "defendant Edmond DiSandro, et al." However, before deliberations, the trial justice's instructions made clear that punitive damages could be assessed only against defendant and not against defendant's law firm.

porting both of [the plaintiff's] * * * theories, [and] *either one of which, standing alone,* would support recovery." 117 R.I. at 503, 369 A.2d at 661; *see also Aldrich v. Lyman,* 6 R.I. 98, 103 (1859). Here, too, the plaintiff's battery and fraud claims, "standing alone, would support recovery." Moreover, in a situation mirroring the present one, this court noted the potential saving grace of the trial justice's requesting special findings from the jury. *Pinkerton's,* 474 A.2d at 443 n. 5. Indeed, in *Pinkerton's* this court specifically rejected the "poison pill" theory advanced by the defendants here and stated that "[i]f a jury has made special findings, it may be unnecessary for this court to reverse a judgment, *even in the event that it may find insufficient evidence to support one or more of the alternative theories [of liability].*" (Emphasis added.) *Id.* Here, because the jury's verdict concerning the battery and deceit claims was unequivocally supported by the evidence and does not appear to be duplicative in any way, I would affirm the judgment below and the damages awarded on the basis of the validity of these claims alone without remanding the case to the Superior Court for a new trial.

### Conclusion

For these reasons I would reject the defendants' arguments on appeal, uphold the trial justice's rulings, and affirm the judgment below.