[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
This legal malpractice action is before the Court following a non-jury trial.[1] Criterion Holdings, Inc. (hereinafter "Criterion" or "Plaintiff") seeks damages from Hinckley, Allen, Snyder, LLP (hereinafter "HAS" or "Defendant) for sums expended in defense of an injunction action and for settlement of a contract dispute with Peter Bruno (hereinafter "Bruno"), Criterion's former president. At issue is the conduct of HAS attorney Pasco Gasbarro, Jr., Esq. (hereinafter "Gasbarro") in connection with employment agreements and related matters between Bruno and the Plaintiff.
 FACTS AND TRAVEL
Criterion is the United States subsidiary of a German company, Vereinigte Deutsche Nickel-Werke AG ("VDN"), that retained HAS and relied on the legal services of HAS to prepare, among other things, two agreements to govern the terms of employment for its president, Bruno. The first agreement was executed in 1992 and covered the five year period through 1997. The second was executed in 1997 but was terminated for cause the same year when the company discovered malfeasance on the part of Bruno.[2]
The company and Bruno had also entered into a stock transfer agreement, not prepared by HAS, executed in 1996 but dated June of 1995, whereby Bruno received 51% ownership of the company subject to retransfer back to the company in the event of his termination. This agreement was predicated on the parent company's desire to avoid having to report Criterion's losses on its books for German accounting purposes. The stock transfer agreement was also subject to German law and designated Germany as the forum in the event of dispute. Although HAS did not draft these documents, Gasbarro did give Bruno advice regarding the signing of same.
The employment agreements were both prepared by HAS attorney Gasbarro. The 1992 agreement contained both a not-for-cause and a for-cause termination clause. A company representative signed the agreement after the document was read and certain provisions questioned. The 1997 agreement omitted the not-for-cause clause, and contained a modified provision for prohibition against making loans. The 1997 agreement was signed by a company representative without anyone from the company having read the document or having consulted with Gasbarro, relying on Bruno's false claim that it was the same as the 1992 agreement.
Bruno was referred to HAS by an accounting firm in April of 1989. After becoming involved with the account in June of 1989, Gasbarro prepared a draft stock purchase agreement for Bruno the same year and a draft employment agreement in 1991. Bruno was the in-state contact person for Criterion's Board and Gasbarro delivered the draft agreements to the Board through Bruno. Gasbarro communicated with members of the Board other than Bruno relative to the 1992 employment agreement and other business matters, including the acquisition of a recycling company. Gasbarro counseled Bruno about the stock transfer and advised him that the not-for-cause clause was detrimental to his stock ownership position. Gasbarro did not communicate with anyone other than Bruno relative to the 1997 employment agreement.
In December of 1997, after discovering extreme irregularities in his financial reporting to the company,[3] Criterion's German board members came to Rhode Island to terminate Bruno and, for the first time, discovered that HAS had a conflict in the dispute. During a meeting at the offices of HAS on December 8, 1997, Gasbarro delivered a memo advising Criterion that a conflict existed because he had represented Bruno in the creation of the employment agreements.[4] Subsequently, Bruno was terminated.
Bruno sued to enjoin the company from terminating his employment and retransferring his stock back to the company and for breach of contract and damages. A request for an injunction was denied after a four day hearing. See Bruno v. CriterionHoldings, Inc., WC/98-0146, Decision Rendered By Mrs. Justice Thunberg. The suit, including the German proceedings, was ultimately settled in 2001 with Criterion paying Bruno $750,000.00 in full settlement of all his claims.[5]
Criterion initiated the instant legal malpractice action in 1999, claiming that HAS was negligent and had breached its fiduciary duty to the company by failing to properly advise the company regarding both the 1992 and the 1997 employment agreements. Criterion asserted that HAS' negligence and breach of duty resulted in costs to Criterion for the defense of the injunction action and the defense and, ultimately, the settlement costs of the lawsuit. Specifically, Criterion claimed that had HAS exercised reasonable care in representing Criterion, the for-cause language would have been more favorable to the company in both the 1992 and the 1997 agreements and the not-for-cause clause would have remained in the 1997 agreement such that Bruno would not have had grounds to maintain a legal action.
 STANDARD OF REVIEW
Rule 52(a) of the Rhode Island Superior Court Rules of Civil Procedure provides that "[i]n all actions tried upon the facts without a jury . . . the court shall find the facts specially and state separately its conclusions of law thereon. . . ." Sup. R. Civ. P. 52(a) (2003). In accordance with this authority in a non-jury trial, "the trial justice sits as a trier of fact as well as law." Hood v. Hawkins, 478 A.2d 181, 184 (R.I. 1984). "Rule 52(a) does not require the trial justice to set forth all facts presented at trial or to explain why each legal result asserted by a party was not accepted by the court." Kottis v.Cerrilli, 612 A.2d 661, 665 (R.I. 1992). Rather, "brief findings will suffice as long as they address and resolve the controlling factual and legal issues." White v. Le Clerc, 468 A.2d 289, 290
(R.I. 1983).
 ANALYSIS
There are three elements a plaintiff must establish to prevail in a legal malpractice action: first, that an attorney-client relationship existed giving rise to a duty, second, that the defendant-attorney breached that duty, and third, that the plaintiff suffered harm as a result of the defendant's breach.Vallinoto v. DiSandro, 688 A.2d 830, 844 (1997). The plaintiff has the burden of proving each of these elements by a fair preponderance of the evidence. Marcera Bros. of Cranston, Inc.v. Gelfuso Lachut, Inc., 740 A.2d 1262, 1264 (R.I. 1999). Since HAS admits that an attorney-client employment relationship existed between the firm and Criterion, giving rise to a duty, the first element is uncontested. Defendant challenges, however, the allegation that a duty was breached and asserts that "the services provided were intended to be and were in the best interest of the plaintiff." (Post Trial Reply Memorandum of Defendant at 6)
The duty an attorney owes to his client is to deliver the requisite "ordinary skill and care in the management of the business entrusted to him." Holmes v. Peck, 1 R.I. 42 (1949). Therefore, Criterion must first prove that Gasbarro failed to deliver ordinary skill and care to the company in preparing the employment agreements. It is well established that "[a]n attorney's pursuit of interests adverse to or conflicting with his or her client's interests constitutes a breach of the attorney's fiduciary obligations to that client and exposes the attorney to liability for legal malpractice." Vallinoto,688 A.2d at 845.
As an initial matter, despite some inherent level of conflict in drafting any employment agreement that would be palatable both to employer and employee, the evidence does not support a finding that Gasbarro delivered less than the ordinary level of skill and care to Criterion in negotiating the 1992 agreement. At that time, Criterion was anxious to install Bruno as its president and the parent company reviewed, questioned and made changes to the agreement prior to signing. (Deposition of Wolfgang Knop at 54-57). In fact, of the three parties that reviewed the agreement on behalf of the parent company, one, Mr. Bastuck, was a German lawyer working in New York. Id. at 54. Additionally, Gasbarro communicated with members of the board and Plaintiff's expert testified that the for-cause language used in the 1992 agreement was "within the scope of what I had seen in other agreements and representing other clients." (Testimony of Wayne M. Kezirian, Esq., Transcript of March 30, 2005 at 69)
On the other hand, notwithstanding the later-retracted statement in the December 8, 1997 memo admitting that he had represented Bruno's interests, as opposed to the Plaintiff's, the evidence presented clearly showed that Gasbarro drafted the 1997 employment agreement for the primary benefit of Bruno. Testimony and documentary evidence showed that Gasbarro communicated only with Bruno relative to the 1997 agreement and that he advised Bruno and represented Bruno's best interests, paying particular attention to Bruno's 51% stock ownership position. Gasbarro himself testified that he advised Bruno that removing the not-for-cause termination clause would protect against losing his 51% shareholder stake. Defendant asserts at this time that the agreements were drafted with Criterion's best interests in mind because the company was "extremely interested in keeping Bruno." However, there is no evidence to this effect or of any discussion with anyone other than Bruno as to the potential ramifications to the company resulting from the lack of a not-for-cause termination clause and the narrow for-cause termination language, particularly in light of the fact that Bruno now owned 51% of the stock, a detail that didn't exist in 1992. Furthermore, Criterion provided expert testimony supporting the claim that these actions lacked the ordinary skill and care required to serve Criterion's best interests relative to the 1997 employment agreement. SeeFocus Investment Assocs., Inc. v. American Title Ins. Co.,992 F.2d 1231, 1239 (1993) ("[T]he most widely accepted rule is that a legal malpractice plaintiff must present expert testimony establishing the appropriate standard of care. . . ."). Paul Tremblay, a professor of legal ethics and member of the Boston Bar Association Ethics Committee, testified that Gasbarro (and HAS) improperly counseled Bruno; failed to properly consult with, advise and seek authority from Criterion, and had a conflict of interest that he failed to properly disclose. (Testimony of Paul Tremblay, Esq., Transcript of March 30, 2005 at 19-20)[6]
Likewise, Wayne Kezirian, a corporate attorney in Rhode Island for more than fifteen years, testified that considering Bruno's 51% shareholder status, the for-cause termination language so favored Bruno and the omission of the not-for-cause language so altered the contract, that failure to discuss both with Criterion amounted to breach of the duty of care. (Testimony of Kezirian, Transcript of March 30, 2005 at 74-76). In light of the undisputed duty HAS owed to Criterion, the evidence clearly supports a finding that Gasbarro breached the duty of care: he drafted the 1997 employment agreement but failed to advise Criterion while actively counseling Bruno, whose interests were directly opposed to the company's, regarding both the agreement and the stock ownership.
Still, having determined that Gasbarro in fact breached a recognizable duty is not in itself enough to establish HAS' liability for legal malpractice. See Macera Bros.,740 A.2d at 1264 ("[P]laintiff must prove by a fair preponderance of the evidence not only a defendant's duty of care, but also a breach thereof and the damages actually or proximately resulting there from."). It is also incumbent upon the Plaintiff to prove that the breach caused the Plaintiff to sustain damages. Id.
Criterion posits that the sums expended to defend and settle the Bruno claims represent such damages and that they were directly caused by Gasbarro's actions. HAS counters that Criterion has failed to prove that but for Gasbarro's negligence, these costs would not have been incurred.
To establish the causal link between the costs incurred by Criterion and Gasbarro's tortuous conduct, Criterion is required to prove that had Gasbarro exercised adequate skill and care, the litigation and settlement costs, i.e. the damage, would not have been incurred. See Scuncio Motors, Inc. v. Teverow,635 A.2d 268, 269 (1993) (holding that plaintiff was "doomed to lose his franchise" regardless of the attorney's negligent advice). In the instant case, this determination requires a two part analysis since Plaintiff's alleged damages arose from two distinct sources: the legal fees to defend the injunction, and the cost of the settlement with Bruno.
The injunction.
Criterion incurred legal costs defending an injunction action in which the company ultimately prevailed. Therefore, Criterion must prove, by a preponderance of the evidence, that but for Gasbarro's breach, Bruno would not have sued to enjoin his termination and the stock retransfer. In other words, Criterion must prove that had the 1997 contract not been altered, the $90,000 defense cost would not have been incurred. Criterion has failed to meet this burden. In the first place, the not-for-cause termination clause that was omitted from the 1997 agreement stipulated that in the event of such a termination Bruno would be paid the balance of his salary accruing on the contract. The termination occurred in December of 1997, at the very beginning of a five year contract, and the potential payout amounted to in excess of two million dollars. Considering the long list of egregious charges that the company had accumulated against Bruno to support grounds for termination, it is very unlikely that the not-for-cause termination clause would have been relied upon. In fact, Plaintiff admits that Bruno would have been terminated for — cause to avoid such a payout. (Testimony of Jacobson, Transcript of March 28, 2005 at 64) Secondly, regardless of the scope of the for-cause termination clause, it is similarly unlikely that Bruno would have walked quietly away from his large salary and the possibility that he could retain 51% ownership of stock and take control of the management of the company.[7]
Additionally, in light of the egregious accusations, Bruno had incentive to fight the termination in order to protect his position in any tangential litigation — for example, a criminal complaint. The Plaintiff has failed to produce any evidence to show that had the contract contained different language Bruno would not have at least tried to retain his post, his income and his ownership position. Plaintiff seems to suggest that had the not-for-cause provision remained, the company could secure the stock retransfer based on an underlying right to terminate and then fight over whether or not termination was for cause, thus negating Bruno's ability to seek an injunction. However, it is highly unlikely that Bruno would forgo suit unless he was assured that the termination was not-for-cause, or unless he was actually compensated in accordance with the not-for-cause clause terms. In fact, the injunction action was in some part a failed attempt to assert his controlling shareholder status and it is likely that he would make such an attempt regardless of the terms of the contract. Furthermore, the $90,000 cost ostensibly accrued in defense of the injunction was for services rendered over the six month period from December 1997 through the close of the injunction hearings, in connection with uncovering the extent of Bruno's improprieties. It is reasonable to assume that much of these services would have been rendered even had the four day hearing not occurred. Accordingly, the $90,000 expenditure cannot be deemed to have been caused by Gasbarro's breach.
The Settlement.
Plaintiff voluntarily settled with Bruno for $750,000, $500,000 of which Plaintiff anticipated would be the cost of defense if settlement did not occur, $250,000 of which Plaintiff describes as a "premium" over anticipated legal costs. The issue is whether this cost would not have occurred but for Defendant's breach — which was manifested in the poorly drafted 1997 employment agreement. See Scuncio, 653 A.2d at 269. In order for the $500,000 defense cost to be attributable to HAS, Plaintiff must prove that had the 1997 contract not been so adversely altered (had HAS not breached), no such cost would have accrued or that it would have been less. See Fishman, 487 N.E. 2d at 1380 ("A plaintiff will prevail . . . if he proves that he probably would have obtained a better result had the attorney exercised adequate skill and care."). However, in order for the $250,000 "premium" to be attributable to Defendant, Plaintiff must prove that the underlying action would have been lost, that the loss would have equaled or exceeded the $250,000, and that the loss would have been due to the altered contract (the breach).[8] Seeid. (explaining the traditional approach to determining whether, if a claim had not been settled, plaintiff would have recovered more than he received in the settlement). This is accomplished by first conducting a "trial within a trial." Id.
If it is determined that Plaintiff would have lost the underlying action, Defendant's negligence would be the cause of the damages that Plaintiff would have paid up to the $250,000 actually disbursed.[9] If, on the other hand, it is determined that Plaintiff would have won the underlying action, Defendant's negligence cannot have caused the damages.
Simple math makes clear that the reliance on the not-for-cause termination clause, given its more than two million dollar price tag, would not reduce either figure; to the contrary, the costs to Criterion would have been far greater had this clause been relied upon. Clearly, omission of the not-for-cause clause, in and of itself, did not cause Criterion any damages. Still, Plaintiff argues that had the contract not changed, either summary judgment would have been obtained prior to settlement, thereby reducing Criterion's costs, or Criterion would have been more certain of victory, thereby negating the need to settle. As to summary judgment, Criterion points to the additional language added to the 1997 contract allowing for Bruno to make loans of up to $100,000 without board approval. Criterion asserts that this language allowed for Bruno to make himself a $31,000 interest free loan, which under the 1992 employment contract would have been clear grounds for termination.
Summary judgment is granted when there are no issues of material fact and the case can be decided as a matter of law.Steinberg v. State, 427 A.2d 338, 340 (R.I. 1981). It is "a drastic remedy and should be cautiously applied." Ardente v.Horan, 117 R.I. 254, 256-57, 366 A.2d 162, 164(1976). During a summary judgment proceeding "the court does not pass upon the weight of the evidence but must consider the affidavits and other pleadings in the light most favorable to the party opposing the motion." Palmisciano v. Burillville Racing Association,603 A.2d 317, 320 (R.I. 1992). As Plaintiff acknowledges, Bruno had explanations for all of the items about which Criterion complained. (Post Trial Memorandum of Plaintiff at 21). Additionally, the language in the 1992 agreement ostensibly forbidding loans contained an exception for "salary and expense account advances in accordance with Employer's policy." (Defendant's Exhibit B at 193). Without other written policy on which to make a determination as a matter of law,[10] it is speculation to assume that had the 1992 agreement terms been in force, a judge, looking at the evidence in the light most favorable to Bruno, would have determined that the $31,000 was a forbidden loan, rather than a salary or expense account advance. It is more likely that this would have been deemed a question of material fact. Plaintiff acknowledges this uncertainty: allowing that the $31,000 loan "might have given Criterion clear grounds to terminate Mr. Bruno." (Post Trial Memorandum of Plaintiff at 23) (emphasis added). Since summary judgment was unlikely, a trial on the merits would have been necessary under the terms of either employment agreement.
Although there is risk with any litigation, a preponderance of the evidence suggests that it was very likely that after trial Criterion would have prevailed in the Bruno litigation under the terms of both the 1997 and the 1992 employment agreements. Bruno violated written company policy by advancing $700,000 to a vendor, and by presenting false financial information to the Board on numerous occasions. He lied to the German Board members when he assured them the 1997 employment agreement was the same as the 1992 agreement.[11] He had taken a $31,000 personal loan, had put his son's car on Criterion's insurance policy and had given a company car to his daughter, all without Board approval. Additionally, Plaintiffs discovered a significant number of suspect financial transactions totaling up to $150,000. Consequently, the $250,000 premium cannot be said to have been caused by the breach, because, had Criterion not settled, this cost would not have accrued. Rather, the $250,000 was the result of a business decision to be rid of the Bruno litigation. (Deposition of Wolfgang Knop at 88 ("Then the other Board members in Germany convinced me this 250 and then the case is gone.") (sic)) While, as Plaintiff suggests, the case against Bruno may have been stronger under the terms of the 1992 agreement, the same inducement to settle would have been present: namely to avoid the time and cost of defense. Indeed, Plaintiff acknowledges that the main incentive to settle was the "substantial risks faced by Criterion that if it did not prevail it would be unable to terminate Mr. Bruno and would be unable to remove him as President of Criterion" because of his 51% stake in the corporation. (Post Trial Memorandum of Plaintiff at 10-11).
On the other hand, if Plaintiff did not settle, then the Bruno suit would have proceeded and, presumably, the $500,000 cost of defense would have accrued. However, since it was just as likely that Bruno would have sued under the terms of the 1992 employment agreement if his termination was for-cause,[12] and if his termination was not-for-cause the company would be liable for the more than two million dollar balance of compensation, this cost of defense cannot be attributed to Defendant's breach (the adverse changes in the 1997 agreement). Accordingly, none of the settlement costs can be attributed to HAS' breach of duty.
To summarize, it is useful to look at how Criterion breaks down the justification for settlement into three elements: "(a) the risk that Mr. Bruno would prevail on the issue of termination and retain 51% of Criterion's stock; (b) the risk that Mr. Bruno would prevail on the issue of "for cause" termination, and Criterion would owe Mr. Bruno in excess of $2 million in compensation; and (c) saving attorneys' fees and costs to defend the Bruno litigation and litigate the stock issue in Germany." (Post Trial Memorandum of Plaintiff at 12.) Unless Criterion invoked the not-for-cause provision, which by its terms would have cost the company in excess of two million dollars, each of these risks would still have existed under the 1992 agreement terms. Accordingly, Plaintiff has not established that any damages were caused by Defendant's breach.
 FINDINGS OF FACT AND CONCLUSIONS OF LAW
After careful review of all the evidence introduced, the testimony of the witnesses and memoranda submitted by the attorneys, the Court makes the following findings of fact and conclusions of law.
 1. Criterion and related entities in the United States were the United States sales distribution arm of a German-owned metals company that was part of a group of German companies whose majority shareholder was Vereinigte Deutsche Nickel-Werke AG ("VDN"). In addition, Criterion acquired in the early 1990's a recycling operation in Rhode Island.
 2. Criterion had approximately $100 million in annual sales and perhaps 100 employees, a significant portion of whom worked in Rhode Island. Criterion's headquarters are and were in Rhode Island.
 3. At some point, VDN set up a company in the United States with Bruno as the president.
 4. Gasbarro became an associate with Defendant HAS in approximately 1983 and a partner in approximately 1989.
 5. Bruno was referred by the accounting firm of Ernst Young to HAS in April of 1989.
 6. Gasbarro sent the rough draft of Bruno's first draft employment agreement to Bruno in August of 1991. Gasbarro explained the implications of the for-cause and not-for-cause clauses. Gasbarro used an office form for the source of the for-cause termination provisions.
 7. Gasbarro did not provide direct counseling to the German members of Criterion's Board regarding the 1992 employment agreement, the stock transfer agreements, or the 1997 employment agreement.
 8. The 1992 agreement was reviewed by officials of the parent company before it was signed and company officials made suggestions which were incorporated into the 1992 agreement.
 9. Gasbarro provided legal advice to Bruno with respect to Bruno's potential acquisition of Criterion stock. The legal advice included tax advice, methods of paying for the stock and avoiding dilution.
 10. At all times, bills for HAS's work were sent to Criterion, Bruno was never billed personally.
 11. Gasbarro advised Bruno regarding draft stock transfer agreements that were sent to Bruno from Dr. Knop.
 12. Criterion transferred 51% of its stock to Bruno in order for the parent company in Germany to avoid having to report the losses of the company on its own annual earnings report.
 13. Wolfgang Knop drafted the documents transferring the 51% of the stock to Bruno and drafted a retransfer agreement so that the 51% could be retransferred to the company upon Bruno's death or termination.
 14. Pursuant to the stock transfer/retransfer agreements, disputes were governed by German law and were to be handled in German courts.
 15. When Bruno was terminated, Plaintiff brought suit in Germany for the retransfer of the 51% of the stock back to the company. Bruno did not answer the German suit, but moved in the Rhode Island Superior Court for an injunction to stop the retransfer. His motion was denied.
 16. In 1996 Gasbarro discussed with Bruno the fact that the 1992 employment agreement was expiring and suggested changes that would be beneficial to Bruno considering his stock ownership position, including removal of the not-for-cause clause.
 17. Gasbarro prepared the 1997 agreement but did not directly notify the Board that he was making changes.
 18. The only difference between the 1992 employment agreement and the 1997 employment agreement is that the termination without cause provision was removed from the 1997 agreement and the prohibition against making investments or loans to any person was changed to a prohibition against making any investments or loans of more than $100,000.
 19. Bruno made a $700,000 advance to a customer without Board approval. This was cause for termination under the terms of either employment agreement.
 20. Bruno lied to the Board of Directors on a number of occasions and failed to fully advise the Board about the financial condition of the Company. This was cause for termination under either employment agreement.
 21. The 1997 employment agreement was signed by the representatives of the parent corporation without anyone from the parent corporation reading it.
 22. The 1997 employment agreement was signed by the parent company representatives after Bruno told them it was the same employment agreement that was signed in 1992.
 23. On December 8, 1997, when Criterion's German Board members came to Rhode Island to terminate Bruno, Gasbarro prepared a conflicts memorandum stating that HAS had represented Bruno in negotiating the employment agreements. Gasbarro prepared the memorandum principally because of his concern that Bruno was taking the position that HAS had represented him over the years. If the situation turned adversarial, Gasbarro wanted to make sure that HAS was protected.
 24. Attorney William A. Jacobson represented Criterion in the Bruno litigation.
 25. Mr. Jacobson's representation began in mid-December of 1997.
 26. In March of 1998, Bruno sued Criterion in Washington County Superior Court seeking damages and injunctive relief that included the return of his stock and restoration to his position as Criterion's President.
 27. The Bruno litigation was settled as of August 29, 2001. Under the terms of the settlement agreement, Criterion paid Bruno $750,000 and Bruno gave up any claim to Criterion stock, and all lawsuits involving Criterion, VDN, related parties and Bruno were dismissed with prejudice. In addition, Bruno dismissed, with prejudice, lawsuits he had against former Criterion employees, Arthur Rash and Joseph Lantini.
 28. Bruno's obligations to Criterion included a $31,000 interest free loan he had taken without the Board's knowledge. In addition, Bruno had provided highly inaccurate financial projections to Criterion, had put his son's car on Criterion's insurance policy, and had given a company car to his daughter without paying for it.
 29. Criterion had a problem with Bruno's employment that related to his 51% ownership of Criterion stock. Under the terms of the stock transfer, Bruno was only required to return the stock if his employment were terminated. There was a question of whether he had to return his stock if he were terminated but the termination was improper.
 30. Over a period of four days during March — April of 1998, Judge Thunberg held a hearing on Bruno's injunctive action seeking the return of his Criterion stock and other relief. Justice Thunberg decided that jurisdiction belonged in Dusseldorf, Germany in accordance with the terms of the stock transfer agreement. Injunctive relief was denied.
 31. In the course of the Bruno litigation, Attorney Jacobson and his law partner, Daniel Kaplan, met with Gasbarro and HAS attorney and executive committee member Michael DeFanti. In that meeting, HAS denied that they represented Criterion in connection with Bruno's employment agreements.
 CONCLUSION
Gasbarro's conduct in preparing the 1997 employment agreement, advising Bruno regarding his best interests in light of his stock ownership position, and failing to notify Criterion about the patent conflict of interest and the ramifications of the new contract terms, amounts to a breach of the duty he owed to his client. However, standing alone, an attorney's breach of duty does not create liability in a legal malpractice action and Criterion has failed to prove that Gasbarro's negligence was the proximate cause of the litigation and settlement costs. SeeScuncio, 635 A.2d at 269. Therefore, Criterion has failed to prove an essential element of the claim for legal malpractice. Accordingly, judgment should enter in favor of defendant.
Counsel shall prepare an order consistent with this decision.
[1] In light of the fact that this case has been decided on the merits, this Court declines to address Defendant's Rule 53 motion for judgment as a matter of law.
[2] The shoe dropped when it was discovered that Bruno's financial forecast for the year was completely off.
[3] In August of 1997 Bruno reported to the Board that Criterion would realize a $2.3 million profit for the year; in October of 1997 Bruno projected a loss of $280,000; and by the end of 1997 the loss amounted to $2 million. (Deposition of Wolfgang Knop at 82) This was the third or fourth year in which the company learned that Bruno's previous forecasts were unachievable. Id. at 75.
[4] Gasbarro later retracted this assertion.
[5] The settlement agreement also procured Bruno's promise to dismiss ancillary suits he had pending against Criterion employees Joe Lantini and Arthur Rash. (Testimony of William A. Jacobson, Esq., Transcript of March 28, 2005 at 67-68)
[6] Professor Tremblay noted that Gasbarro's conduct violated the Rules of Professional Conduct by not disclosing the conflict of interest. Defendant, citing Vallinoto, protests that such a violation "`does not automatically establish a private cause of action sounding in negligence for breach of fiduciary obligation'" and therefore has "no bearing on whether defendant's actions amounted to malpractice." (Defendant's Post Trial Memorandum at 16 (quoting Vallinoto, 688 A.2d at 837)) However, a "violation of these rules is "relevant in a claim for breach of fiduciary obligation." Vallinoto, 688 A.2d at 837 (holding that the ethics violations were not probative where the plaintiff had failed to plead breach of fiduciary duty). Additionally, "if a plaintiff can demonstrate that a disciplinary rule was intended to protect one in his position, a violation of that rule may be evidence of the attorney's negligence." Fishman v. Brooks,487 N.E. 2d 1377, 1381 (Ma. 1986). "[A]n expert on the duty of care of an attorney properly could base his opinion on an attorney's failure to conform to a disciplinary rule." Id. at 1382. Therefore, Gasbarro's failure to conform to the conflict of interest rule is evidence that he breached his duty to Criterion.
[7] Ironically, the bait that may have hooked Bruno into bringing suit was the company's transfer of the stock to him to avoid German auditors.
[8] If Plaintiff would have lost under the 1992 contract terms as well, then the breach could only have caused that amount of loss greater than the loss under the 1992 contract terms.
[9] Plaintiff notes that Bruno was seeking two million dollars in damages.
[10] "This is a company that really didn't have policies and procedures to speak of. So really the only lawful business instructions were the attachments to the contract." (Testimony of William Jacobson, Esq., Transcript of March 28, 2005 at 54)
[11] Plaintiff claimed that this amounted to fraud in the inducement. (Testimony of Jacobson, Transcript of March 28, 2005 at 90-91)
[12] While Plaintiff complains that the for-cause language should have been more employer friendly, particularly in light of Bruno's ownership position, this provision was accepted after review and comment prior to execution in 1992. Since company representatives signed the 1997 agreement believing it to contain the same language as the 1992 agreement and knowing that Bruno had acquired 51% of the stock, it is reasonable to believe that this clause was acceptable. Additionally, it is unlikely that Bruno would have agreed to any change in the for-cause provision considering that he had already committed various infractions. Therefore, this provision would probably have remained in a 1997 employment agreement even if Gasbarro had not breached his duty to the company.